Alfred U. McKENZIE et al., Plaintiffs,

v.

Samuel SAYLOR, Defendant.

Civ. A. No. 974–73.

United States District Court,
District of Columbia.

Jan. 30, 1981.

Douglas L. Parker, Institute for Public
Representation, Dale F. Swartz, Wash-
ington Lawyers Committee for Civil Rights
Under Law, Elliot Mincberg, Hogan &
Hartson, Washington, D. C., for plaintiffs.

David H. Shapiro, Asst. U. S. Atty., Washington, D.C., for defendant.

Thomas P. Powers, Washington, D.C., for intervenor Washington Printing and Graphic Communications Union of North America, AFL–CIO.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

In January 1977 this Court ruled in a class action claim brought by three black employees of the United States Government Printing Office (GPO) that on the basis of the undisputed facts there was clear and convincing evidence that black workers in the Offset Press Section (OPS) of the Government Printing Office were the victims of racial discrimination in that they have been denied promotion opportunities to which they were otherwise entitled. *McKenzie v. McCormick*, 425 F.Supp. 137 (D.D.C. 1977). The Court concluded that the rights of the plaintiff class of black workers, as provided by law, had been violated and they were entitled to appropriate legal and equitable relief under the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–16.

The Court's decision was based principally on the unchallenged statistical data and undisputed material facts generated through several rounds of discovery. Those data and facts revealed an unmistakable pattern of racial discrimination against black OPS employees over an extended period of time. In particular, the facts demonstrated that black OPS workers were underrepresented in supervisory and journeyman positions; subjected to wide and unexplained disparity in wages; exposed to promotion procedures and policies lacking in objectivity and discriminatory in operation; and excluded from meaningful participation in training and career development programs which might have enhanced their opportunities for promotion.

Following the Court's ruling and in an attempt to secure well-considered recommendations and appropriate measures to be included in a final order designed to eliminate discriminatory practices, two experts were appointed under the authority of Rule 53, Fed.R.Civ.P. The experts, Mitchell Fein and A. John Geis, were selected from a list of qualified nominees suggested by counsel for the parties. Messrs. Fein and Geis were directed to study and analyze job positions and training opportunities; to make recommendations regarding job qualifications and promotion procedures; and to suggest procedures in the selection, training and promotion of personnel in the Offset Press Section, all directed against racially discriminatory practices. Their assignment and responsibility was spelled out in a document entitled *Protocol Regarding Procedures For Court-Appointed Experts*, filed April 3, 1978. The experts first submitted a draft report which was subject to review and comment by counsel for the parties. Their *FINAL REPORT* was submitted on July 23, 1979.

It was not surprising that the experts' findings and conclusions were not accepted fully by either party. Nonetheless, their efforts were creditable and substantial. Together with other relevant data of record they served as a basis for the fashioning of an order providing for final relief.

After the submission of the *FINAL REPORT*, the parties embarked on lengthy negotiations designed to effect a stipulated settlement of the many still unresolved issues. Each side made concessions and on various occasions optimism was expressed. Finally, however, they announced their inability to agree.

The plaintiffs submitted a lengthy proposed order accompanied by a supporting legal memorandum. The GPO filed a brief opposing many of plaintiffs' proposals. The Washington Printing and Graphic Communications Union, an intervening defendant representing journeymen at the GPO, presented its view and comments on plaintiffs' proposals concerning the Letterpress Transfer Program.

While there have been expressions of concern and some efforts by the GPO management to change the employment patterns in the Offset Press Section in light of the Court's January 1977 ruling, there has been no startling change or cause for great expectations in the overall status of the black workers. In April 1979, the Court approved on a temporary basis, pending a final order of relief, a new training program for printing plant workers—the Feeder/Assistant Training Program—but thus far, no employee has completed the program and moved into a journeyman position.

After an interval of four years, the overall status of the black worker in the OPS still presents a situation demanding more than the imposition of general injunctive sanctions against future discrimination. Blacks are still denied promotion at a fair and equitable rate. While the number of black journeymen has increased somewhat since the 1977 ruling, the black worker remains badly underrepresented in uprate and supervisory positions. At present there are no black foremen or assistant foremen in the OPS. These conditions persist despite the disproportionately large percentage of black workers in the printing plant worker categories which existed prior to and throughout the history of this litigation.

In October 1980, the Court convened a hearing on the plaintiffs' proposed order. At that time plaintiffs' counsel assessed the situation as one in which the GPO management still remains insensitive to problems associated with its promotion practices for blacks and has undertaken little to reduce the serious disparity between the number of blacks at the lower levels and the number of blacks at the higher levels.* Supplemental data submitted to the Court indicate that is not an invalid assessment. Following that hearing, additional memoranda were submitted by the parties in support of their respective positions. On the basis of the entire record and the developments since the 1977 Memorandum Opinion, the Court determines that much of the plaintiffs' proposed order is appropriate and should be adopted. Other provisions, however, particularly those governing back pay, have been modified.

### The Proposed Order

There are four substantive aspects to the final relief afforded in this proceeding:

1. *General Relief* concerning promotion practices available to all OPS workers; provisions for an employees' manual, vacancy notices, recordkeeping, an outside consultant, and a monitoring committee. (¶ ¶ I–II(A), pages 2–8).

2. *Training Programs* designed for promotion of workers to journeyman positions—including maintaining the GPO Feeder/Assistant Program and restriction of workers from the Letterpress Section. (¶ II(B), pages 10–16).

3. *Promotion Procedures* designed to eliminate, as far as practicable, subjective and potentially discriminatory aspects in the evaluation, selection and promotion of black employees to uprate and supervisory positions, together with a limited schedule for temporary goals and timetables. (¶ II(C), pages 16–21).

4. *Monetary Relief*—providing procedures for determining all individual victims of discrimination, and awarding them appropriate compensation. (¶ III, pages 21–25).

### 1. General Relief

The Order provides for certain relief that will benefit all employees of the Offset Press Section. One of the chief discriminatory practices identified in the Court's 1977 ruling was defendant's failure to provide definite standards for job performance and evaluations. Assignments were determined on the basis of subjective evaluation, often made by a single supervisor. Compounding this problem was the GPO's practice of filling vacancies without notice to employees who might have been eligible to apply for consideration. To remedy this problem, the

---

* Transcript of October 14, 1980, at 6, 7, 23, (Hearing on Motion for Final Relief).

Order provides for greater objectivity in personnel practices through the use of written standards for job performance. New job analyses, performed by either OPM or an independent expert, will serve as the basis for formulating objective qualifications for positions in OPS. The qualifications, along with a description of revised promotion and training opportunities available to all personnel, will be set out in an employees manual. The Order also requires that formal notice of all vacancies or training opportunities be posted conspicuously. Improved GPO recordkeeping will provide an employee's complete work history and full qualifications. The GPO is also directed to undertake an education program to assure that all employees understand the mechanics and purpose of the new procedures. Finally, an Equal Employment Opportunity Monitoring Committee is established to oversee the implementation of this Order and to participate in the selection of certain supervisory personnel.

## 2. *Training Programs*

The January 1977 Memorandum Opinion pointed out that training programs through which employees advanced to journeyman, uprate, and supervisory positions had operated in a discriminatory fashion. Accordingly, the Order modifies training procedures to correct past discrimination and to assure equal opportunity in the future. GPO is to maintain only one training program leading to journeyman positions in the Offset Press Section, the Feeder/Assistant Program. This program will be shortened and a new training plan developed by GPO.

This provision effectively terminates the Letterpress Transfer Program as of August 26, 1977. Under a preliminary injunction entered that date, offset journeyman positions filled through the Letterpress Transfer Program since that time are deemed vacant and therefore available to graduates of the revised Feeder/Assistant Program. The Union intervenor objected strenuously to this aspect of the plaintiffs' proposed Order on the grounds that it contravened the collective agreement between the Union and GPO and unfairly penalized employees who had been cross-trained from Letterpress to Offset.

The Court notes, however, that GPO, the Union, and employees in the Letterpress Transfer Program all had advance notice that transfers taking place after the August 26, 1977 Order were temporary and subject to any final relief afforded in this lawsuit. Moreover, GPO and the Union were well aware that the Letterpress Transfer Program had been identified as one of the discriminatory practices which had led to the exclusion of class members from journeyman positions. *See* 425 F.Supp. at 141. The Court therefore believes it is neither improper nor inequitable to close off the Program as a means of obtaining journeyman positions in OPS. Implementation of this provision will be stayed, however, pending the completion of a study by GPO on the impact of this change and of possible alternatives to Letterpress Transfer as a means of protecting Letterpress journeyman. The first full class of Feeder/Assistant graduates will not be eligible for journeyman status for some time. Since the use of offset is increasing, GPO may be able to devise a means for accomodating the interests of Letterpress transferees within the Order's remedial provisions governing training and promotion.

As for training opportunities for uprate and supervisory slots, the Order provides that all OPS journeymen shall rotate through the various programs so that equal access can be assured.

## 3. *Promotion Procedures and Goals*

In its initial 1977 ruling, the Court found that GPO's promotion practices discriminated against class members. To eliminate the potential for further abuse, defendant is required to adopt new procedures for selecting supervisors, uprates, and entrants to the journeyman training programs. To remedy the present effects of past discrimination, the Order also provides for short-term goals in promotion.

In selecting entrants to the revised Feeder/Assistant Program, GPO is to accord first preference to those class members who demonstrate, in the course of the back-pay proceedings described below, that they were wrongfully denied admission to a journeyman training program in the past. Of the remaining slots in each entering class, 75 percent are to be reserved for OPS employees on the basis of their seniority within Offset Press Section. The remaining 25 percent will be open to those employees who pass a newly-devised written examination. Only those trainees who *successfully* complete the Feeder/Assistant Program, including the periodic skills tests, will become eligible for journeyman status.

In the case of promotions to uprate and supervisory positions, the Order provides for input from OPS employees but leaves the final decision with GPO management. Applications for uprate and supervisor slots will first be screened by a five-member selection panel. The selection panel will be composed of employees holding positions above or equal to the vacancy under consideration. Three of the five members of each panel must be black, and three are to be nominees of the Equal Employment Opportunity Monitoring Committee established by this Order. Using the objective criteria to be developed under this Order, the selection panel shall narrow the field of applicants to the five best qualified. The names of the five candidates will then be forwarded to the Superintendent of the Offset Press Section, who shall select one to fill the vacancy.

As with training for journeyman positions, the Court finds it necessary to set a goal for the promotion of class members to uprate and supervisor so as to remedy the lingering effects of defendant's past discriminatory practices. Although defendant strongly opposed judicial imposition of this type of relief, "at this point in the history of the fight against discrimination, it cannot seriously be argued that there is any insurmountable barrier to the use of goals or quotas to eradicate the effects of past discrimination." *United States v. City of Miami*, 614 F.2d 1322, 1335 (5th Cir. 1980)

(footnote omitted). Such goals can be part of a negotiated settlement, *see id.*, or judicially imposed, *see, e. g., Crockett v. Green*, 534 F.2d 715 (7th Cir. 1976). The Court believes the particular percentages adopted here are reasonable in light of the composition of the applicant pool for the various positions.

### 4. *Monetary Relief*

The parties differed widely in their proposals for monetary relief to the class members. Under the plaintiffs' proposal all members would be presumptively entitled to back pay, a suggestion hotly contested by the GPO. The proposal would establish three funds: for journeymen, uprates and supervisors. Both back and "front" pay would be disbursed to the class members from the funds. The amount of each fund would be determined by approximating the total amount of pay denied class members since October 24, 1965, due to defendants' discriminatory practices. Each member would be awarded a "share" from a fund, based on the period he or she was denied a position because of discrimination.

No attempt is made to present a line by line analysis of the class plaintiffs' detailed proposals. They reflect serious consideration and no small effort by their counsel. The Court has accorded them careful review.

While there are some features which appear worthy of considerations, others are questionable in light of recent decisions. The proposal for the creation of a fund for class-wide relief falls in the latter category and is therefore unacceptable to the Court. The fund approach advanced by the plaintiffs was developed as a means of avoiding a "quagmire of hypothetical judgment" as to which class members would have been promoted to particular positions. *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 260 (5th Cir. 1974). However, under the Supreme Court's subsequent decision in *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), a finding of a pattern of discrimination against a

class must be followed by individual determinations on retroactive relief for class members, even though this would require "a substantial number of individual determinations in deciding which of the minority employees were actual victims of the ... discriminatory practices." 431 U.S. at 371–72, 97 S.Ct. at 1872–73. Moreover, *Teamsters* places on each class member an initial burden of showing that he or she either applied for a position, or would have applied but for the discriminatory practices. *Id.*, at 362–68, 97 S.Ct. at 1868–71. This approach is incorporated in the Court's final Order. Class members will be required to make an initial showing, by a preponderance of evidence, that they applied for a particular promotion or training opportunity, or that they would have but for GPO's discriminatory practices. Once individual members have taken this initial step, the burden shifts to the defendant to show, by clear and convincing evidence, that the denial was justified, or that the claimant would not have been selected had he applied. *Baxter v. Savannah Sugar Refining Corp.*, 495 F.2d 437, 444–45 (5th Cir.), *cert. denied*, 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974); see *Bundy v. Jackson,* 641 F.2d 934 at 947 (D.C. Cir. 1981).

To allow for the difficulties posed to potential claimants by GPO's practice of simply selecting employees to fill vacancies without allowing others to apply, the Order requires that an initial determination be made as to which positions were filled through formal application procedures, and which were filled without an opportunity for eligible class members to apply (referred to as "noncompetitive positions"). The Order then suggests several types of proof which a claimant might offer to help demonstrate that he or she would have applied for the position. This list is not exclusive, and other evidence deemed relevant would be acceptable.

A second major area of disagreement between the parties concerns the length of the back-pay period. Defendant argues that

back pay should be available only for the period between March 12, 1972, the date on which Title VII became applicable to the government, and the end of 1973, when according to the defendant, the Court-appointed experts believed the GPO had ended its discriminatory practices. Such a limited back-pay period does not comport with Title VII's broad remedial purposes. Section 706(g) of Title VII provides that "[b]ack pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission." 42 U.S.C. § 2000e–5(g). This two-year period applies to all claims against government employers under Title VII, even where the two-year accrual period would begin before the effective date of the 1972 amendments. *Thompson v. Boyle*, 499 F.Supp. 1147, 1173–74 (D.D.C. 1979); *Chewning v. Schlesinger*, 471 F.Supp. 767, 774 n. 14 (D.D.C. 1979). The amount of back pay due individual claimants in this case will therefore be computed from March 12, 1971, two years before the initial administrative complaint was filed with GPO.

█ Moreover, the patterns and practices discussed in the January 1977 Memorandum Opinion reveal a continuing violation of the rights of plaintiff class beginning well before the effective date of the 1972 amendments. It is appropriate to take into account these factors in determining any entitlement to back pay relief. *See Bethel v. Jefferson*, 589 F.2d 631, 636 (D.C. Cir. 1979); *Huntley v. HEW*, 550 F.2d 290, 295–96 (5th Cir. 1977). It is thus appropriate to consider the effects of defendant's discriminatory policies after August 8, 1969, the effective date of Executive Order No. 11478,** the first of a series of antidiscrimination Executive Orders which applied to GPO. *Thompson v. Boyle*, 499 F.Supp. at 1174.

█ Once an individual class member is determined to be entitled to back pay, he shall continue to receive any difference between his current pay and the pay to which he is entitled until he is promoted to his

---

** 34 Fed.Reg. 12985 (August 8, 1969).

rightful position. A prospective award, or "front pay" is necessary to make whole those class members wrongfully denied advancement. *E. g., James v. Stockham Valve & Fittings Co.*, 559 F.2d 310, 358 (5th Cir. 1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978) (citing cases). Orders awarding front pay have recently been entered in two cases in this district. *See Thompson v. Boyle*, 499 F.Supp. at 1175; *Chewning v. Schlesinger*, 471 F.Supp. 767 (1979). To deny this type of relief to identifiable victims of GPO's discriminatory practices would, in effect, ignore and perpetuate the economic effect of racial discrimination.

The Final Order accompanies this Memorandum Opinion.

### FINAL ORDER

In accordance with this Court's Memorandum Opinion entered January 12, 1977, granting the plaintiffs' motion for a summary judgment and denying the defendant's cross-motion for summary judgment, and the accompanying Memorandum Opinion, it is this 30th day of January, 1981,

ORDERED that judgment is entered for the plaintiff class composed of all past, present and future black employees of the Offset Press Section of the Government Printing Office, and against the defendant Public Printer, Samuel Saylor; and it is

FURTHER ORDERED that the plaintiff class is entitled to injunctive relief as follows:

### I. *GENERAL INJUNCTION*

(A) For purposes of this Order, "Defendant" shall refer to the GPO, its officers, agents, servants, employees, attorneys, successors (including any successor created by Act of Congress or otherwise) and all persons or organizations in active concert or participation with it. The Defendant is hereby permanently enjoined and restrained from discriminating in any aspect of employment against the Plaintiffs on the basis of race and from failing or refusing to implement fully, or to participate and cooperate in the implementation of, the provisions set forth in the body of this Order.

(B) No person shall be retaliated against or discriminated against by Defendant because that person has opposed any practice of Defendant challenged in this lawsuit, or because he or she has made a charge, testified, assisted or participated in any manner in any stage of the investigation, proceeding or hearing of this case.

(C) It shall be a violation of this Order for Defendant to deny, deprive or attempt to deny or deprive, any member of the Plaintiff class of a right or benefit to which he or she is entitled by the terms and provisions of this Order.

### II. *REQUIRED CHANGES IN PROMOTION AND TRAINING PROCEDURES*

(A) *Remedies Applicable to All Employees*

(1) *Notification of Promotion Opportunities and Procedures*

(a) Within 90 days after the date of this Order, the GPO shall publish a new, separate employees' manual to ensure that all employees fully understand the procedures by which promotions and training can be obtained. Such manual shall incorporate the standards and procedures required to be adopted pursuant to the terms of this Order. If such standards and procedures are not complete within 90 days after the date of this Order, the manual shall be promptly revised to set forth those standards and procedures upon their completion. Such manual shall also, in a manner consistent with all the terms of this Order;

(i) describe in detail the specific work and responsibilities required for each position in the Offset Press Section;

(ii) set forth the specific prerequisites for promotion to each such position; including the years of experience required in other positions; training required, if any; the exact procedure by which such training is provided to employees; and all other qualifications for such position;

(iii) set forth the relative weights, if any, given to the various factors or criteria, such as years of service or tests scores, if applicable, used in selecting individuals for promotion to each such position or for training relevant to such position; and

(iv) set forth the exact procedure, illustrated by charts or diagrams, required to be followed by an employee who wants to be considered for each such position.

(b) The GPO shall ensure that notices of specific job vacancies are posted separately and conspicuously in the Offset Press Section, under the legend "Job Openings." Notice of vacancies or potential vacancies shall be posted immediately upon receipt of information by the Personnel Office or other responsible employees of the GPO which indicates that a vacancy will occur within the ensuing eighteen-month period.

(c) After the GPO has posted notice of a vacancy as required by subparagraph II(A)(1)(b), no provision of the manual required to be prepared by GPO pursuant to subparagraph II(A)(1)(a) above relating to such vacancy, or any of the procedures described therein relating to such vacancy, may be changed by the GPO until after such vacancy is filled. Compliance with this subparagraph is required to ensure that employees are aware of all prerequisites and procedures for promotion and that GPO does not change those prerequisites and procedures after employees have relied upon them.

(2) *Additional Recordkeeping Requirements*

Within 90 days after the date of this Order, GPO shall create a new form, to be included in each employee's personnel file, which shall record all actions and facts relating to the possible promotion of that employee subsequent to the date of this Order. This form, referred to herein for convenience as a "promotion flow record," shall record all training and experience, inquiries or applications relating to promotion or training relevant to promotion, test results, and interviews (including the names of persons conducting such interviews and

the results thereof). The "promotion flow record" shall also list each position or training experience for which the employee could be considered and the specific prerequisites (including any required experience) for selection for such positions. When an application for promotion or training is denied, such forms shall state the reasons therefor, including an indication of the specific prerequisite not satisfied and reasons therefor. Separate forms may be developed for persons lower than journeyman and for persons occupying supervisory positions. Each employee of the Offset Press Section shall be entitled to inspect his own "promotion flow record" in addition to all other records pertaining to him or her maintained at any time by the GPO. With the prior authorization of the employee involved, such records shall be made available upon request to the Committee established pursuant to subparagraph II(A)(3) below and the GPO Equal Opportunity Office, and may be used to monitor the promotion process and the progress of the GPO in complying with this Order.

(3) *Equal Employment Opportunity Monitoring Committee*

(a) Within 30 days after the date of this Order, Plaintiffs will submit to GPO the names of ten (10) class members who will serve as the Equal Employment Opportunity Monitoring Committee (the "Committee"), which will be responsible for monitoring GPO's compliance with the terms of this Order. If any of the designated Committee members leave the Offset Press Section of the GPO or resign from the Committee, the Committee shall promptly notify GPO of the name(s) of the person(s) who shall serve as replacement(s).

(b) Each Committee member shall be authorized five (5) hours of official duty time each month to carry out his or her responsibilities as a member of the Committee. The Superintendent of the Press Division shall be given not less than 48 hours' notice of the intention of the members of the Committee to meet and shall provide a suitable place within the GPO for those meet-

ings. No one other than the members of the Committee may attend such meetings except at the request of the Committee. Members of the Committee shall be allowed to request information from, and meet with, other GPO employees, and all employees shall be informed by GPO of their continuing right to communicate with the Committee members. GPO shall designate one person each from the Personnel, General Counsel, and Equal Employment Opportunity Offices to serve as liaison with the Committee, to be responsible for ensuring GPO's compliance with this Order and to monitor and compile all data and reports required to be maintained and provided by this Order. One member of the Committee, selected by the Committee, shall also serve as a member of any equal employment opportunity committee that meets regularly with the Public Printer.

(c) GPO shall make available to the Committee all public reports of the GPO's Equal Employment Opportunity Office. In addition, three months after the date of this Order and every three months thereafter, GPO shall provide to the Committee a report setting forth:

(i) any change in the status, including promotion, transfer, resignation or retirement, and the reasons therefor, of any employee of the Offset Press Section;

(ii) any transfer of any person into the Offset Press Section;

(iii) a description of all complaints or disputes arising during the preceding three-month period regarding equal employment opportunity in the Offset Press Section;

(iv) any changes in the organization of the Offset Press Section or in any of the procedures or practices relating to promotion opportunities within the Offset Press Section;

(v) any deviation from the provisions of this Order;

(vi) GPO shall also provide promptly to the Committee all other information requested by the Committee respecting promotions or promotion procedures and practices in the Offset Press Section.

GPO shall not be required to provide any information pursuant to this paragraph II(A)(3)(c) which it would be prohibited by law from disclosing to members of the Committee.

(d) In addition to any other reports or information provided to the Committee pursuant to this Order, GPO shall also immediately notify the Committee in writing of the selection by GPO of any person to enter any training program (including the Feeder/Assistant Program and the Apprentice Program) in the Offset Press Section, or the selection by GPO of any person to be promoted to any uprate or supervisory position in the Offset Press Section. No such selection shall become effective until a date 30 days after the date such notice was provided to the Committee.

(e) The Committee may prepare with the assistance of its counsel, annually on the anniversary of the date of this Order, a brief report to the Court setting forth its conclusions concerning the extent of GPO's compliance with the terms of this Order and the extent to which the Order has eliminated racially discriminatory promotion practices in the Offset Press Section.

(f) The Committee shall be entitled to designate three of the five persons serving on any selection panel established by the GPO pursuant to paragraph II(C)(3) below. The persons thus designated by the Committee shall meet all qualifications necessary to serve on such panel as provided in paragraph II(C)(3). The Committee shall also be entitled to designate one of the persons administering skills tests given pursuant to paragraph II(B)(2)(b) below. Nothing in this paragraph (f) shall be deemed to deprive the Washington Printing and Graphic Communications Union No. 1, International Printing and Graphic Communications Union of North America, AFL–CIO, hereinafter referred to as "Union", of its right to approve the selection of training instructors under Section 52 of the Collective Bargaining Agreement between Union and the United States Government Printing Office.

(4) *Training In Equal Employment Opportunity Responsibilities*

All persons responsible for evaluating the performance of Offset Press Section employees shall be provided formal training by the GPO in using any newly-established evaluation procedures adopted pursuant to this Order and in the need to meet the goals and timetables for the promotion of class members set forth herein. Compliance with these procedures and the goals and timetables shall be included as a factor in GPO's evaluation of all training, managerial and supervisory personnel to ensure that the professional advancement of those persons is in part dependent on their fulfillment of equal employment opportunity ("EEO") obligations.

(5) *Development of Performance Standards*

(a) Defendants shall arrange for the Office of Personnel Management (OPM) to have that agency, within 20 days after the date of this Order, begin to prepare job analyses and valid performance standards as required in this Order. In the event that OPM is unable to detail qualified personnel to undertake these analyses, the parties shall advise the Court immediately and within 10 days thereafter submit a list of nominees from which the Court will appoint an outside consultant, to be paid by GPO at his or her standard hourly rate. The expert appointed by the Court shall have the same right of access to GPO employees and records and the same freedom from interference as would OPM personnel performing the same study. GPO shall instruct all employees to cooperate fully with either OPM or the Court-appointed expert.

(b) For the purpose of this Order,

(i) The term "job analysis" shall mean the study of a job designed to break the job down into discrete elements or components. The purpose of a job analysis is threefold:

A. To identify the important components of the job.

B. To identify important aspects of the work environment.

C. To identify the knowledge, skills, and abilities which may be required to perform the job successfully.

Such job analyses shall be conducted in accordance with generally accepted professional standards in the field of industrial psychology and the federal government's Uniform Guidelines on Employee Selection Procedures, as adopted by the Equal Employment Opportunity Commission, the Office of Personnel Management, the Department of Labor, and the Department of Justice (43 Fed.Reg. 38290, August 25, 1978). The results of each job analysis should be used to construct a job inventory which lists and describes the job duties and job tasks which comprise the job, as well as the importance of each duty and task to successful job performance. A job duty is generally defined as a principal work activity performed by one employee. Job duties are made up of related activities called tasks. Two or more tasks are related if their mutual accomplishment contributes directly to the accomplishment of a given job duty. The job inventory should be compiled through the use of a combination of data gathering or information gathering techniques including (but not limited to):

A. a review of all written materials (e. g. job descriptions, training materials, etc.);

B. interviews with incumbents;

C. interviews with supervisors;

D. observation interviews in which incumbents are observed and questioned as they are actually performing the job; and

E. participant observations in which the job analyst attempts to actually perform some aspects of the job.

The job inventory should also list the knowledges, skills, and abilities believed to be necessary for the accomplishment of each job task.

After a job inventory has been compiled it should be reviewed by the employees occupying the job under study, a representative group of employees at the next higher job level, and a Union representative(s) of the unit in which these employees are em-

ployed. OPM or the outside consultant shall consider the collective knowledge of these employees to determine the importance of each job component as well as the comprehensiveness of the total inventory. Each job analysis should produce not only a comprehensive job inventory, but it should also produce a measure of the relative importance of each job duty and task to successful job performance.

(ii) The term "valid performance standard" shall mean valid and reliable performance standards for the important or critical components of each job in the Offset Press Section which should be as objective as possible and defined in such a manner that they can be applied in the same manner to each employee in the job for which that standard was developed. A performance standard should be developed for each important or critical task and duty identified through the job analysis.

(B) *Remedies Relating To Training And Selection of Journeyman*

(1) *Length of Training And Selection Procedure*

(a) For a period of four years from the date of this Order, GPO shall continue to operate the training program described in GPO Instruction 625.6, CH–13 (February 16, 1978) (the "Feeder/Assistant Program") as the sole program by which any employee of the GPO (other than a person who is an Offset Press Assistant or an Apprentice as of the date of this Order) may be trained to become a journeyman pressman in the Offset Press Section; provided, however, that the Feeder/Assistant Program shall be modified as provided in paragraph II(B)(1)(b). If, during the four-year period following the date of this Order, GPO wishes to change the Feeder/Assistant Program in any respect, it shall, prior to the implementation of any such change, notify the Committee of the proposed change and the reason therefor. If the Committee objects to such proposed change in writing within 10 days after receipt of notice thereof, the proposed change in the Feeder/Assistant Program shall not be imple-

mented by GPO unless the specific approval of the Court is obtained.

(b) For all persons entering the Feeder/Assistant Program subsequent to the date of this Order, the four "steps" of such program set forth in paragraph 2 ("Progression Through Program") of GPO Instruction 625.6, CH–13 (February 16, 1978) shall be reduced from a total minimum time of three years to a total minimum time of two years. The GPO may schedule training and changes in rates of compensation during that two-year period in its discretion, but must design a training program that will train employees within a two-year period to be fully qualified Offset Press Assistants, eligible to be appointed to third-year apprentice positions. GPO shall, within 60 days from the date of this Order, establish a training plan or "Itinerary" for each phase of the Feeder/Assistant Program, which will set forth in detail the skills and knowledges which are intended to be imparted at each phase of such Program, and which will also set forth in detail responsibilities of specific GPO personnel to provide such training. If there are more trainees qualified for advancement from one step of the program to another than there are vacancies at the next step, advancement will be based solely on seniority in the Feeder/Assistant Program. Determination of the number of vacancies at the Offset Press Assistant level shall be made in a manner consistent with paragraph II(B)(5) hereof.

(c) Selection of persons to enter the Feeder/Assistant Program shall be made from among persons who are current or former employees of the Offset Press Section. Within thirty days after the date of this Order, GPO shall prepare and conspicuously post in the Offset Press Section under the legend "Seniority Roster" a roster (the "Seniority Roster") of all current and former employees of the Offset Press Section who are still employed at the GPO. The Seniority Roster shall be arranged according to length of service in the Offset Press Section and shall be updated as necessary. Placement in the Feeder/Assistant Program shall be offered first to those class

members determined to have been wrongfully denied training opportunities in the past under the procedure set out in paragraph III below. Of the remaining vacancies in any Feeder/Assistant Program beginning subsequent to the date of this Order, 75% shall be filled solely on the basis of length of service in the Offset Press Section as shown on the Seniority Roster in effect as of the date of such selection, and 25% shall be filled from among those employees on the Seniority Roster who elect to take a test to determine their eligibility. Such test shall be validated, and the passing score on such test shall be determined, in accordance with Uniform Guidelines on Employee Selection Procedures, 42 Fed.Reg. 38290, August 25, 1978. From among those employees on the Seniority Roster who elect to take the test and who at any time subsequent to the date of this Order achieve a passing score on such test as defined above, selection for the Feeder/Assistant Program shall be based solely on the length of such persons as shown on the Seniority Roster in effect as of the date such selections are made. If any person entitled to be selected for a position in the Feeder/Assistant Program declines such selection, she or he shall retain her or his position on the Seniority Roster and may be considered for any future vacancies in such program. Further, if any person elects to take the test referred to herein and does not obtain a passing score on such test, such person shall remain eligible for selection to any future program on the basis of seniority, and may take the test again at any time it is given in the future.

(d) Notwithstanding the provisions of the preceding subparagraph (c), no person shall be entitled to be selected for a position in the Feeder/Assistant Program unless such person has a satisfactory leave and disciplinary record during the six-month period immediately prior to such selection. Any person not selected for a position in the Feeder/Assistant Program because of an unsatisfactory leave or disciplinary record shall, however, be entitled to be considered for any future vacancies in such program if he or she has a satisfactory leave and disci-

plinary record during the six months immediately prior to any such future selection. Within 30 days from the date of this Order, the GPO shall submit to Plaintiffs' counsel a statement in writing of the factors it proposes to consider in determining whether employees' leave and disciplinary records are satisfactory. In the event the GPO and Plaintiffs' counsel are not able to reach agreement concerning such factors, the Court shall be promptly advised of such disagreement and may issue a supplementary order setting forth the factors which GPO may consider in evaluating leave and disciplinary records.

(2) *Evaluation of Trainees.*

(a) The evaluations and skills tests required by paragraph 4 of GPO Instruction 625.6, CH–13 (February 16, 1978) (as amended by subparagraph (b) below) shall be carried out by GPO pursuant to procedures developed by OPM or the outside consultant retained pursuant to paragraph II(A)(5) above. Such procedures will be developed by OPM or the outside consultant within 18 months after the date of this Order. The evaluations and skills tests will be based on a job analysis (as defined above) for each position involved, and shall include objective standards for the assessment of relevant skills, knowledge, speed and accuracy in performing each component of a particular assignment. They will focus on performance of those duties and tasks determined to be critical (through the job analysis process) to the accomplishment of GPO's training objectives for the positions involved. OPM or the outside consultant will establish in writing the minimum acceptable standards of performance on such evaluations and skills tests.

(b) At the end of each step of the Feeder/Assistant Program, each employee participating in the program shall be given a final skills test designed to determine the employee's eligibility for advancement to the next step of the program. The final skills tests will be developed in accordance with the requirements of the preceding subparagraph (a), and will be administered by

a panel of not less than three GPO employees, at least one of whom shall be a journeyman Offset Pressman and at least one of whom shall be designated by the Committee. The final skills test for each step will be based on an assignment or assignments designed to test the employee's ability to solve a problem or group of problems which are representative of those arising in the regular operation of offset press equipment and which the employee could reasonably be expected to be able to solve after completion of the training provided during the training step just completed. For each final skills test, OPM or the outside consultant shall establish in writing the minimum acceptable performance which will be considered passing. Each person passing the final skills test shall be deemed to be qualified for advancement to the next step of the Feeder/Assistant Program, regardless of his or her performance on previous evaluations or skills tests.

### (3) *Selection of Offset Press Assistants to Become Apprentices.*

Subject to the provisions of subparagraph II(B)(4) hereof, selection of Offset Press Assistants to enter the Apprenticeship Program shall be based solely on length of service in the Feeder/Assistant Program or other Offset Press Section training program in existence prior to the date of this Order. Determination of the number of vacancies in any future Apprenticeship Program shall be made in a manner consistent with paragraph II(B)(5) hereof.

### (4) *Advancement of Current Offset Press Assistants.*

Within 60 days from the date of this Order, all persons who are Offset Press Assistants as of the date of this Order shall be appointed to positions as third-year apprentices, with a craft specialty as Offset Pressmen. Upon successful completion of the last two years of the Apprenticeship Program, those persons shall become Offset Press Journeymen.

### (5) *Procedure For Filling Vacancies.*

(a) Until such time as 90% of all journeyman pressman positions in OPS are filled by members of the plaintiff class, 90% of all vacancies at the journeyman pressman level in OPS shall be filled by those members of the plaintiff class who have completed the Apprenticeship Program and who, prior to entering the Apprenticeship Program, were employed in the Offset Press Section. For the purposes of this paragraph II(b)(5), such vacancies at the journeyman pressman level shall be considered to include all positions filled at the journeyman pressman level at any time subsequent to August 26, 1977 (the date the Court entered a Preliminary Injunction requiring all such positions to be filled on a temporary basis subsequent to the date of that injunction), except those positions filled by persons who were employed in the Offset Press Section immediately prior to their selection to fill such positions. In the event that there is at any time an insufficient number of class members who have completed the Apprenticeship Program to fill vacancies at the journeyman pressman level, such vacancies may be filled by other employees, but only on a temporary basis, until such time as eligible class members are available to fill these positions.

(b) In calculating the number of persons to be selected to enter the Feeder/Assistant or any other training program, or to become Offset Press Assistants or to become Offset Press Assistants or Apprentices, all positions filled at the Offset Press Journeyman level since August 26, 1977 by any person who was not employed in the Offset Press Section immediately prior to their selection for such positions shall be considered to be vacant. The persons occupying those positions shall continue to do so on a temporary basis, and all such positions shall be available to class members who complete the Apprenticeship Program subsequent to the date of this Order.

It is provided, however, that the implementation of paragraph II(5)(a) and (b) of this Order shall be stayed until GPO submits a full report on the impact of these

provisions on GPO personnel. The report shall include: a projection of vacancies in the position of offset pressmen due to either retirement or promotion of incumbents and/or expansion of the Offset Section; a projection of the number of letterpress positions to be eliminated; a list of positions other than offset pressman for which letterpress operators are qualified or could be cross-trained; and an assessment of alternatives to the Letterpress Transfer Program designed to protect the interests of letterpressmen whose present positions are jeopardized by technological change. The report shall be filed within 30 days of the date of this Order.

(C) *Remedies Relating To Training and Selection Of Uprates and Supervisors.*

(1) *Rotation of Training Opportunities*

(a) GPO shall immediately prepare a list of all training opportunities (such as training in uprate or supervisory positions) or temporary assignments (such as Acting Group Chief) which are available to journeymen within the Offset Press Section.

(b) Based on the list described in subparagraph (a) above, GPO shall prepare a schedule which shall provide for the rotation of such training or assignments among all journeymen in the Offset Press Section, such schedule to be posted conspicuously in the Offset Press Section under the legend "Schedule of Training Opportunities for Journeyman." Such training or assignments shall first be offered to those black journeymen whose average annual hours of training in each such position for each year since becoming a journeyman is less than the average of the annual number of hours in each such position of white journeymen. For example, if the average white journeyman has received 100 hours of web press training each year since becoming a journeyman, any black journeyman who has not received 100 hours of such training each year since becoming a journeyman shall be entitled to priority in future training opportunities on the web presses until his average annual hours equal 100.

(2) *Evaluation Criteria and Procedures.*

Evaluation of journeymen and uprates during training for uprate or supervisory positions and in performing responsibilities as journeymen or uprates shall be based on objective performance standards developed by OPM or the outside consultant as provided herein. OPM or the outside consultant appointed pursuant to paragraph II(A)(5) shall, within 18 months after the date of this Order, complete a job analysis and develop valid performance standards (as defined in paragraph II(A)(5) *supra*, page 8) for each position, including each training position, at or above the level of Offset Press journeyman in the Offset Press Section. The valid performance standards developed in this manner shall be incorporated into a written procedure for evaluating persons at each such position and shall include, if considered desirable by OPM or the outside consultant, work simulation tests, evaluation of leave and disciplinary records, and such other factors determined to be valid, relevant and job-related.

(3) *Selection Procedure For Uprates And Supervisors.*

To eliminate the subjective and potentially discriminatory procedure of the selection of employees by a single selecting official, GPO shall adopt the procedure described below with respect to each promotion to an uprate or supervisory position in the Offset Press Section subsequent to the date of this Order.

(a) *Composition of Selection Panels.*

For each uprate or supervisory vacancy occurring in the OPS subsequent to the date of this Order, GPO shall establish a selection panel, consisting of five persons employed in the Offset Press Section whose jobs are at a level at or above that of the particular vacancy involved. At least three of the members of each such panel shall be black, and at least three of the members of each such panel shall be designated by the Equal Employment Opportunity Monitoring Committee as provided in paragraph

II(A)(3)(f) above (page 7). In the event an insufficient number of black employees at the requisite job level is available from the Offset Press Section, black employees may be selected from another section of the Production Department to be members of a panel.

(b) *Selection Procedures—Identification of "Best Qualified"*

The panel shall select a group of "Best Qualified" employees to be considered for each vacancy at an uprate or supervisory position. For all positions below the level of Foreman, the group of "Best Qualified" employees shall be selected from among all journeymen with at least one year of experience in the Offset Press Section and satisfactory leave and disciplinary records for the six months prior to such selection (established pursuant to the procedure set forth above at paragraph II(B)(1)(d) *supra*, (page 12). For such position, the panel will select no fewer than 20, or 10%, whichever is larger, of all such journeymen to be considered as "Best Qualified." The panel shall base its selection of the "Best Qualified" employees on a comparison of evaluations prepared for employees using the performance standards established pursuant to paragraph II(C)(2) above (Page 17) and on such other factors as OPM or the outside consultant determines are valid and job-related. For all positions at the level of Foreman or above, the group of "Best Qualified" employees shall be all employees at the level immediately below the position to be filled.

(c) *Selection From Among "Best Qualified."*

The panel shall evaluate those employees found to be "Best Qualified" using an "evaluation and selection guide" prepared by OMP or the outside consultant appointed pursuant to paragraph II(A)(5) hereof. The "evaluation and selection guide" shall set forth factors to be considered by the panel in the selection of uprates or supervisors, and shall be based upon the analysis of the jobs to be performed and the organization of the Offset Press Section. Among the factors to be included shall be a person's ability to work with or supervise a racially mixed group of employees. The "evaluation and selection guide" shall also direct the members of the panel to take into account the GPO's continuing obligation to meet the goals and timetables for the promotion of minority employees set out in paragraph II(C)(4) below. The members of the panel may in their discretion interview members of the "Best Qualified" group of employees, but must interview all such employees if they wish to interview any of them. The members shall then select five of the "Best Qualified" candidates and forward their names and their evaluations to the Superintendant of the Offset Press Section, who shall review their qualifications and the recommendations of the selection panel and then select one to fill the vacant position.

(4) *Goals and Timetables*

(a) *Uprates.* For all uprate positions in the Offset Press Section, GPO shall achieve a percentage goal of 60% of such positions to be occupied by members of the Plaintiff class within four years after the date of this Order. In order to achieve that goal, GPO shall use an 80% selection rate to such positions to ensure that no less than 80% of all vacancies in uprate positions occurring after the date of the Order shall be filled by members of the Plaintiff class.

(b) *Group Chiefs and Assistant Foremen.* For all Group Chief and Assistant Foreman positions in the Offset Press Section, GPO shall achieve a percentage goal of 60% of such positions to be occupied by members of the Plaintiff class within four years after the date of this Order. In order to achieve that goal, GPO shall use a selection rate of 80% to such positions to ensure that no less than 80% of all vacancies in Group Chief and Assistant Foreman positions occurring after the date of the Order shall be filled by members of the Plaintiff class.

(c) *Foreman.* For all Foreman positions in the Offset Press Section, GPO shall adopt and seek to achieve a percentage goal of

50% of such positions to be occupied by members of the Plaintiff class within four years after the date of this Order.

(d) The 80% selection rates set forth in subparagraphs (a) and (b) above shall be achieved by the end of the second year following the date of this Order and by the end of each succeeding two-year period thereafter until the applicable percentage goal is achieved.

(e) The 80% selection rates set forth above shall be calculated by considering all selections to Uprate and Group Chief and Assistant Foreman positions, as appropriate, subsequent to the date of this Order. In determining which promotion positions shall be filled by members of the Plaintiff class, the first four out of every five vacancies at the position involved shall be filled by members of the Plaintiff class.

(f) If at the end of two years after the date of this Order, GPO has not complied with the 80% selection rates set forth in subparagraphs (a) or (b) above, the selection rate for such positions shall be increased to 90%, and GPO shall make all future selections for such positions from the entire group of all Offset Press Section employees who have at least one year of experience as journeymen in the Offset Press Section and who have satisfactory leave and disciplinary records (determined pursuant to paragraph II(B)(1)(d) above at page 12) for the six-month period immediately preceding the date on which selections are made, i. e., selections for such positions shall not be limited to the group of "Best Qualified" employees. The increased selection rates set forth in this paragraph shall be achieved by the end of the fourth year following the date of this Order and by the end of each succeeding two-year period thereafter until the applicable percentage goal is achieved.

## III.  MONETARY RELIEF

### (A) Preliminary Proceedings

#### (1) List of class members

Within 15 days after the date of this Order defendants shall file a list of class members. Plaintiffs shall propose any additions to this list within 15 days.

### (2) Appointment of Special Master

The Court shall appoint a Special Master to conduct all proceedings relating to money awards to be made to class members.

As an initial step, the Master shall conduct whatever proceedings may be necessary to determine those positions within the Offset Press Section to which promotions were made by formal application and competition (either for a training program or to the position itself), and those positions or programs filled without formal notice and application, or through other non-competitive means.

### (3) Notice to class members

Following the classification of positions and programs described above, counsel for the plaintiffs shall submit for the Court's approval a proposed notice to all class members containing:

(a) a summary of the contents of this Order;

(b) notification that as class members they may be entitled to back pay;

(c) a description of the procedure (set out herein) to be followed in establishing entitlement to back pay;

(d) notification that any class member shall have the right to be represented by counsel of his choice during the back pay proceedings, and that unless and until such counsel contact plaintiffs' class counsel, each class member will continue to be represented by class counsel.

Once the Notice to class members has been approved, defendant shall mail a copy to all class members forthwith. Within seven (7) days after the Notice has been approved, counsel for the defendant shall file a certification that copies have been mailed to all class members as provided by this Order.

### (4) Filing of individual claims

(a) Class members who wish to file claims shall notify plaintiff class counsel,

either directly or through retained counsel of their own choice, within 30 days after the Notice to class members is approved.

(b) Within 90 days after the notice to class members is approved, plaintiff class counsel shall file a list of claims presented by individual class members. Defendants shall file their responses to these claims within 60 days thereafter. The Special Master shall then schedule additional proceedings on contested claims as necessary.

(B) *Entitlement*

(1) To receive back pay for training or promotions available through formal application, class members must demonstrate entitlement to back pay by showing that they applied for such training or promotion and were rejected.

(2) To receive back pay for training and promotion to positions available through informal or noncompetitive means, class members may demonstrate entitlement by showing they would have applied for the training or promotion had they known of its availability. In demonstrating that they would have applied, class members may show, among other facts,

(a) general eligibility to apply for the training or promotion by virtue of the position held by the would-be applicant at that time; (e. g. journeymen applying for an uprate position);

(b) formal application for other, similar training or promotion opportunities; and/or

(c) that the claimant notified appropriate supervisory officials of his or her interest in being considered for future opportunities.

(3) Defendants may rebut the entitlement of any claimant by proving (a) that the particular position applied for was filled by another black worker; or (b) that the claimant did not possess the necessary qualifications for the position or training program. The qualifications to be applied are to be no more stringent than those actually applied to any white employee promoted to the position in question or admitted to the training program.

(4) The initial demonstration of entitlement shall be made by a preponderance of the evidence. On rebuttal, defendant must show any lack of entitlement by clear and convincing evidence.

(5) In an appropriate case, the Master may consider claims for back pay based on possible promotions beyond the first level of advancement claimed. For example, should a class member assert that he was denied a journeyman position in 1972, he may also attempt to demonstrate that he would subsequently have been promoted to an uprate position. To support such a claim, a class member may offer evidence showing the interval between promotions for similarly placed and qualified white employees.

(C) *Calculation*

(1) The amount of back pay to which an individual claimant is entitled shall be determined by subtracting the claimant's hourly pay rate over the back pay period from the hourly rate of the position for which the claimant applied. The difference between the pay rates shall then be multiplied by the total number of hours in the back pay period. For the purposes of this Order, the term "back pay period" refers, in the case of a wrongful denial of a promotion, to the interval between the date of the wrongful denial of the claimant's application (or in the case of noncompetitive positions, the date on which the position was filled) and the date on which the claimant is promoted to his or her rightful position. In the case of a wrongful denial of training opportunities, the back pay period shall run from the date on which the claimant would have completed the training program to the date on which the claimant successfully completes a comparable program. It is provided, however, that no back pay shall be awarded for any denial of training opportunities unless the claimant successfully completes a comparable program. Those class members determined to have been wrongfully denied training opportunities shall be granted preference in gaining admission to training programs commencing after the date of such determination.

In making back pay determinations, the Master may consider employment decisions after August 8, 1969. However, in no case shall the back pay period begin before March 12, 1971.

(2) Any award of back pay shall include all elements of financial loss, including without limitation, retirement, disability, overtime, pension contributions, shift differentials, and vacation and sick leave pay.

(3) A claimant who establishes that he was wrongfully denied promotion or training to more than one position shall elect one position for which he or she shall receive back pay and promotion or training preference.

(4) Where more than one claimant establishes entitlement to a single position, the claimants shall share the back pay award until such time as each is promoted to a comparable position. As each claimant is promoted, the full amount of the back pay shall continue to be paid to the remaining claimant(s).

## IV. *ADDITIONAL PROVISIONS OF ORDER*

### (A) *Superseding Effect of Order*

The provisions of this Order shall supersede any and all conflicting or inconsistent provisions in GPO or OPM rules or regulations, or collective bargaining agreements between GPO and unions representing OPS employees.

### (B) *Status of Persons Promoted Temporarily Pending Final Relief*

Except as provided in paragraph II(B)(5) hereof, all promotions or transfers made on a temporary basis since August 26, 1977, shall become permanent as of the date of this Order.

### (C) *Processing of Complaints of Noncompliance With The Provisions of This Order*

Any complaint by any employee or by counsel for any party that the provisions of this Order have been violated shall be discussed initially by counsel for GPO and the plaintiff class. If counsel for both sides agree as to the correct disposition of a complaint, they may effectuate such disposition without referring it to the Court. The GPO shall maintain a written record of said complaint and disposition. If counsel for both sides do not agree as to the correct disposition of a complaint, either may refer the matter to the Court for disposition. Nothing in this Order shall be construed to bar or preclude the filing of individual complaints of employment discrimination and the normal processing of such complaints pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the rules and regulations of the GPO. Nor shall this Order bar the named Plaintiffs in this action from proceeding to present evidence to this Court relating to their individual claims of racial discrimination, as provided in the Court's decision of January 12, 1977; provided, however, that any monetary relief obtained by the named Plaintiffs pursuant to this Order shall be deducted from any monetary relief otherwise received in this action.

### (D) *Costs and Attorneys' Fees*

Plaintiffs in the above captioned action are the prevailing parties for purposes of entitlement to attorneys' fees and costs. Pursuant to the provisions of the Civil Rights Act of 1964, as amended, the GPO shall pay all reasonable costs and expenses (including attorneys' fees) incurred in litigating this action. Within 30 days from the effective date of this Order, Plaintiffs' counsel shall submit to the Court an appropriate application for attorneys' fees and costs. Thereafter, subsequent to the completion of the calculation of the monetary relief for each of the Plaintiffs pursuant to Section III hereof, Plaintiffs' counsel shall submit a supplementary application for attorneys' fees and costs relating to all work performed subsequent to the date of this Order, including work performed in connection with preparation of the application for attorneys' fees and costs.

**(E)** *Retained Jurisdiction*

The Court hereby retains jurisdiction of this cause for the purpose of issuing any additional orders or decrees needed to effectuate, clarify or enforce the full purpose and intent of this Order. All provisions of this Order which do not terminate by their own terms as provided herein shall continue in full force and effect until such time as GPO petitions for, and obtains from this Court, authorization to terminate them.