Alfred U. McKENZIE, et al., individually and on behalf of all others similarly situated

v.

Danford L. SAWYER, Jr., individually and as Public Printer of the United States and his agents, assigns and successors in office, Appellant.

Alfred U. McKENZIE, et al., individually and on behalf of all others similarly situated

v.

Danford L. SAWYER, Jr., individually and as Public Printer of the United States and his agents, assigns and successors in office

Washington Printing and Graphic Communications Union No. 1, International Printing and Graphic Communications Union of North America, AFL–CIO, Appellant.

Alfred U. McKENZIE, et al., individually and on behalf of all others similarly situated

v.

Danford L. SAWYER, Jr., individually and as Public Printer of the United States and his agents, assigns and successors in office

Washington Printing and Graphic Communications Union No. 1, International Printing and Graphic Communications Union of North America, AFL–CIO.

Nos. 81–1754, 81–1755 and 81–1809.

United States Court of Appeals, District of Columbia Circuit.

Argued March 16, 1982.

Decided July 27, 1982.

As Amended Oct. 15, 1982.

---

See also D.C., 425 F.Supp. 137.

Whitney M. Adams, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, Royce C. Lamberth and Kenneth M. Raisler, Asst. U. S. Attys., Washington, D. C., were on the brief for Sawyer, et al., appellants in No. 81–1754 and appellees in Nos. 81–1755 and 81–1809. David H. Shapiro, Asst. U. S. Atty., Washington, D. C., also entered an appearance for Sawyer, et al.

Daniel B. Jordan, Washington, D. C., with whom Thomas P. Powers, Washington, D. C., was on the brief, for Washington Printing and Graphic Communications Union No. 1, appellant in No. 81–1755 and appellee in No. 81–1809.

Douglas L. Parker, Washington, D. C., with whom Elliot M. Mincberg, Dale F. Swartz and Roderic V. O. Boggs, Washington, D. C., were on the brief, for McKenzie, et al., appellees in Nos. 81–1754 and 81–1755 and cross-appellants in No. 81–1809.

Before BAZELON, Senior Circuit Judge, and MIKVA and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

In this lawsuit, black employees of the Offset Press Section (OPS) of the Government Printing Office (GPO) charge that they have been the victims of racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16 (1976). The case is the second employment discrimination suit against GPO to be decided by this court this year, *see Thompson v. Sawyer*, 678 F.2d 257 (D.C.1982). It was brought as both an individual and a class action, with the class certified to be all present, past, and future black employees of OPS. Record (R.) 8. The complaint alleges that GPO engaged in pervasive failures to hire, train, and promote black employees at all levels within OPS. Despite the fact that a remedy under Title VII was extended to employees of the federal government—and GPO—only in 1972, the plaintiffs contend that patterns of illegal discrimination began at GPO far earlier and have persisted to this day.

The district court granted plaintiffs' motion for summary judgment on all class claims of liability under Title VII.[1] *McKenzie v. McCormick*, 425 F.Supp. 137 (D.D.C.1977). GPO's efforts to seek reconsideration were denied. After extensive study, several proposals, and intervention by the Washington Printing and Graphic Communications Union, the district court issued its remedial decree, over four years later. *McKenzie v. Saylor*, 508 F.Supp. 641 (D.D.C.1981).

---

1. The individual claims of plaintiffs McKenzie, Jones, and Ross are still pending.

The relief order mandated sweeping changes in methods of hiring, training, and promoting in OPS. Stringent goals and timetables were set to ensure that discrimination within OPS was swiftly brought to an end. For example, GPO was directed to fill 90% of journeyman—*i.e.*, craft printer—vacancies in OPS with black OPS trainees, until 90% of journeymen in OPS were black, *id.* at 653. Both the district court and this court have denied GPO's requests for stay of the injunctive order.

The relief order also included back pay, for members of the plaintiff class who demonstrate that they applied, or, but for discrimination, would have applied for advancement within OPS. GPO could rebut such showings by plaintiffs only with proof that the position was filled by a black or that the class member was unqualified. Back pay was extended for the full two-year period allowable under Title VII, 42 U.S.C. § 2000e–5(g) (1976), with the possibility that some back pay awards would reach before the 1972 extension of Title VII to federal employees. Amounts of back pay due were to be calculated on the basis of employment decisions dating back still further, to August 8, 1969, the date of the first Executive Order prohibiting employment discrimination within GPO, 34 Fed.Reg. 12,-985 (1969).

In this appeal, GPO concedes only that racial discrimination may have existed within OPS well before the extension of the right to sue under Title VII to federal employees. GPO contends that beginning before 1972 and continuing thereafter it has made extensive efforts to end discrimination within OPS, and that the district court therefore erred in granting summary judgment to the plaintiffs on the class claims. GPO also argues that the remedial decree imposed goals that are unnecessary and unjust, both to GPO and to others seeking employment in OPS. Finally, GPO contends that the back pay award imposed an unjustifiably rigid rebuttal burden on GPO

and erred in allowing recovery for any events predating the right of federal employees to sue under Title VII.

We affirm in part and remand in part. On liability, we find that the district court's grant of summary judgment was proper in all respects save the determination that GPO had discriminated in hiring journeymen after 1971. On the issue of whether OPS has continued to discriminate in hiring journeymen, we remand to the district court for trial, should the plaintiffs wish to persist. As to the remedy, we must of course vacate those aspects of the decree that were directed towards discrimination in the hiring of journeymen continuing past 1971. Save for a determination that the goals must be modified to some extent, all other aspects of the injunctive decree are affirmed. The award of back pay is also affirmed, except insofar as it applies to the failure to hire journeymen from among the plaintiff class after 1971 and as modified below.[2]

## I. LIABILITY UNDER TITLE VII

Title VII prohibits employers from discriminating among their employees on racial grounds in the terms, conditions, or privileges of employment, 42 U.S.C. § 2000e–2(a)(1) (1976). It also forbids racial discrimination in the provision of training opportunities. *Id.* § 2000e–2(d).

This case comes to us in the posture of an appeal from a grant of summary judgment for the plaintiffs. While the factual disputes involved in most Title VII suits preclude their resolution on summary judgment, summary judgment is available in an appropriate Title VII case, *see Sagers v. Yellow Freight System, Inc.*, 529 F.2d 721, 729 (5th Cir. 1976). It is for us to decide, therefore, whether the district court properly determined that the case posed no genuine issues of material fact and the plaintiffs were entitled to judgment as a matter of law, Fed.R.Civ.P. 56(c); *Stoller v.*

---

**2.** This change will make no practical difference in the back pay award for journeymen hires during the years 1972 and 1973, because all promotions to journeyman during those years went to blacks.

*Marsh,* 682 F.2d 971, 972 (D.C.Cir.1982).[3] We begin with the facts that were not at issue at the time the district court granted plaintiffs' motion for summary judgment.

### A. *Material Facts Not at Issue*

The GPO is a unit of the legislative branch employing workers in the competitive service. OPS is a division of the Offset section, one of four parts of the Production Department at GPO. At the time of the lawsuit, OPS employed five categories of workers relevant here. *Supervisors* included foremen, assistant foremen, and group chiefs. *Journeymen,* qualified craft workers in apprenticeable trades, were responsible for operating most of the machinery in OPS. *Craft uprates* operated some of the more complicated machines such as the two-color or the web press and sometimes performed supervisory duties. *Offset press assistants* were participants in a training program for journeyman positions, eligible for promotion to journeyman vacancies after successful completion of the training program. Finally, *printing plant workers* were unskilled helpers who performed such tasks as loading and cleaning.

Wages for skilled workers in OPS are set by an annual agreement between the pressmen's union and the Public Printer, subject to approval by Congress, *see* 44 U.S.C. § 305 (Supp. IV 1980). Supervisors and uprates receive an incremental percentage of the journeyman rate; for example, foremen and web pressmen receive 130% and 107% of the journeyman rate respectively. Offset press assistants are paid a percentage ranging from 50% to 90% of the journeyman rate, depending on their advancement within the training program. R. 19, Exhibit (Ex.) 4. Printing plant workers are paid the lowest rates within OPS.

After Title VII was extended in 1972 to provide a remedy for federal employees charging employment discrimination, two administrative complaints were filed against OPS. The McKenzie complaint, filed on March 12, 1973, by a black journeyman with many years of service at GPO, charged OPS with discrimination in promotion to uprate and supervisory positions. The Coalition of Minority Workers' complaint (CMW complaint), filed June 4, 1973, alleged discrimination in the training and promotional opportunities made available to black printing plant workers and offset press assistants, as well as in promotion upwards from journeyman positions. Both complaints were rejected by GPO, and became the basis for this lawsuit.[4]

The plaintiffs' case rested largely on sheer numbers. The undisputed data in the record included an analysis by race of employees' positions in OPS during each of the years 1968–73, CMW complaint file at 180; a listing of the numbers of minority and

---

3. GPO also moved for summary judgment, on the theory that the court's role in reviewing Title VII suits against the federal government was limited to a determination of whether substantial record evidence supported the administrative disposition of the employee's complaint. GPO's motion was filed some five months before this circuit decided that plaintiffs suing the federal government under Title VII were entitled to a trial de novo in district court, *see Hackley v. Roudebush,* 520 F.2d 198 (D.C.Cir. 1975), *rev'g Hackley v. Johnson,* 360 F.Supp. 1247 (D.D.C.1973). While the cross-motions for summary judgment were under advisement, the Supreme Court held that Title VII plaintiffs against the federal government have the right to a trial de novo, *Chandler v. Roudebush,* 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976). The plaintiffs suggest that GPO waived its right to a trial de novo by filing its motion for summary judgment. The rule governing cross-motions for summary judgment, however, is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion. If a motion is based on a legal theory later rejected—as here—the movant retains whatever right that party otherwise has to a trial on the merits. *See* 10 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2720 (1973).

4. The genesis of the lawsuit was the McKenzie complaint. Within thirty days of final administrative action on the CMW complaint, plaintiffs sought leave to amend the McKenzie suit to include the additional plaintiffs, R. 7. When the district court permitted amendment of the McKenzie suit, and certified the class as "all ... past, present and future black employees of the Offset Press Section," R. 8, separate proceedings on the CMW complaint were voluntarily dismissed.

non-minority employees holding supervisory positions at OPS in February 1974, R. 19 Ex. 5–C; and lists of the position titles of all OPS employees at the end of the years 1971, 1972, and 1973, R. 19 Ex. 2. As of December 1973, none of the fifteen supervisors in OPS were black.[5] Despite the availability of blacks in the relevant promotion pool—by 1968 there were 12 black journeymen and by 1970 there were 14—the first black was promoted to an uprate position in 1972. CMW complaint file at 189. In 1973, 1972, and 1971 respectively, 18, 19, and 15 blacks and 73, 84, and 88 whites were journeymen. *Id.* By contrast, in the same years 133, 130, and 146 blacks and 3, 10, and 10 whites were printing plant workers. *Id.* All offset press assistants after 1970 were black. In 1970, OPS made 15 promotions to journeyman: 9 white letterpressmen, 2 white offset press assistants, and 4 black offset press assistants. In 1971, OPS made 18 promotions to journeyman: 12 white letterpressmen, 5 whites from the GPO-wide apprenticeship program, and 1 black from the same program. No black offset press assistants were promoted during that year. In the period 1972–73, OPS made 6 promotions to journeyman: they were all black offset press assistants. CMW complaint file at 184.

In addition to these numbers, the record included undisputed evidence about hiring, training, and promotion procedures in OPS. Since 1968, journeyman positions in OPS have been filled exclusively from within GPO. There were three routes by which OPS selected new journeymen. The first was a program to transfer and train journeymen from the letterpress section of OPS, set up because letterpress had become technologically obsolete. All twenty-one of the letterpressmen transferred to OPS in 1970 and 1971 were white. CMW complaint file at 184.

The second route for advancement to OPS journeyman was the GPO-wide apprenticeship program, open both to printing plant workers from throughout OPS and to applicants from the general Civil Service roster, R. 19. Beginning in 1969, over half of the participants in the four-year program were blacks; only one of the ten journeymen assigned from the program to OPS during the period 1968–73, however, was black, CMW complaint file at 184. Participation in the training program for offset press assistants was the third route of advancement to journeyman. Most participants in the offset press assistant program were black printing plant workers from OPS; from 1968–73, ten blacks and two whites became journeyman pressmen through the program. *Id.*

Selections for supervisory and uprate positions were made from among journeymen in OPS. Journeymen became eligible for consideration for promotion to uprate, group chief, or assistant foreman after two years' experience as a journeyman. Foremen in turn were selected only from employees with supervisory experience. J.A. 191. In addition, successful completion of the GPO supervisory development course was required for promotion to supervisory positions, and to uprate positions between 1970–72. CMW complaint file at 160. Before 1971, when GPO began posting notices of vacancies, employees were considered for promotions if they applied, if their supervisors recommended them, or if they had successfully completed the GPO supervisory development course. Applications could be filed by employees who heard about vacancies by word of mouth, but interested employees could also file applications for positions to be considered in the event of a vacancy. After posting began in 1971, all qualified applicants were considered for promotions.

Final selections were made by the superintendent of the entire Offset Section. If fewer than five minimally qualified candidates applied for a position, their applications were sent directly to the superintendent, together with supervisory evaluations

---

**5.** One black was promoted to group chief in March 1974, R. 136, J.A. 493. Evidence of this promotion, however, was not part of the record

on summary judgment but was submitted in connection with the proceedings on relief.

and rating forms and a digest of their employment history. CMW complaint file at 163. If there were more than five minimally qualified applicants, their materials were sent to a rating panel, which selected the five best qualified candidates based on supervisory evaluations, training, and experience. Beginning in 1972, GPO required all promotion panels to include an EEO representative; all of the rating panels convened in 1972 had two white members and the black EEO representative, R. 19 Ex. 3. Beyond the addition of the EEO representative, there were no further changes in the use or structure of promotion panels in OPS during the period at issue.

Participation in the supervisory development program was limited to journeymen with at least one year's experience. Selections were made by the GPO production supervisor and were based on supervisory evaluations, interviews with a panel, and scores on the supervisory development program test. R. 19. Scores for blacks on the test were significantly lower than scores for whites; in 1971 and 1973 respectively, blacks scored 24.8 and 21.0 while whites scored 29.7 and 32.0, CMW complaint file at 186. Of black applicants for the program in 1971, one was ranked best qualified and four were ranked qualified; six whites were ranked best qualified, one better qualified, and five qualified. Comparable figures for 1973 were five blacks ranked qualified, two whites ranked best qualified, four

whites ranked better qualified, and three whites ranked qualified. R. 19.

Aside from the brief period when the supervisory development program was required, no formal training program was offered for promotion to uprate positions. Experience on uprate machinery, however was an important consideration. In the six months following the CMW complaint, blacks received some 137 days of uprate experience, compared with 74 days during the preceding six-month period. CMW complaint file at 12–13.

These were the material facts not at issue. Other allegations plaintiffs made, for example, that the supervisory evaluations were racially biased and that the promotion panels' decisions followed the supervisory evaluations very closely, were disputed. For purposes of a summary judgment motion, these disputes must be resolved against the plaintiffs.

### B. *Applicable Legal Principles*

■ The district court granted summary judgment for plaintiffs on the theory that OPS had engaged in a continuing pattern of discriminatory treatment of blacks. 425 F.Supp. at 141. The essence of a charge of disparate treatment in violation of Title VII is that the plaintiffs were treated differently because of their race. Plaintiffs charging disparate treatment must therefore prove discriminatory animus on the part of their employer.[6] *Texas De-*

---

**6.** In this appeal, the plaintiffs also remind us that they had alleged that certain practices in OPS were in violation of Title VII because they had a disparate impact on blacks, Brief for Plaintiffs at 30. In particular, they contend that the decision to allow letterpress trainees priority in filling journeyman positions over offset press assistants, the heavy reliance on supervisory evaluations, and the examination used in selecting participants in the supervisory development course, had an unduly harsh impact on blacks.

Unlike disparate treatment cases, disparate impact cases do not require a showing of discriminatory animus on the part of the employer. *Connecticut v. Teal,* —— U.S. ——, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982). The plaintiffs must show that the challenged practice operates with different results against blacks and whites; if the employer advances a legiti-

mate business reason for the challenged practice, the plaintiffs must then show that other practices lacking the discriminatory impact could also serve the employer's purposes, *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977).

The district court's grant of summary judgment for plaintiffs, however, was not predicated on the disparate impact theory. Nor could it properly have been at the stage of summary judgment. GPO had disputed the contention that letterpress transferees were given priority over offset press assistants in filling journeyman vacancies, R. 42 at 14. No evidence was in the record comparing the supervisory evaluations received by blacks with those received by whites, and OPS had disputed the contentions that the evaluations were themselves discriminatory or played a decisive role in the promotion process, *id.* at 11. Finally, GPO had

*partment of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981); *Valentino v. United States Postal Service*, 674 F.2d 56 at 60 n.1 (D.C.Cir.1982).

■ A Title VII case in which an individual charges discriminatory treatment will normally proceed in three stages, if fully developed at trial. The plaintiff must prove a prima facie case of differential treatment based on race, by producing evidence sufficiently strong to raise an inference that any differences in treatment were racially motivated. The defendant responds, if possible, with evidence of nondiscriminatory reasons for their treatment of the plaintiff. Finally, the plaintiff attempts to reply that the asserted reasons were merely pretextual. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Thompson v. Sawyer*, 678 F.2d 257 at 282 (D.C.Cir. Apr. 27, 1982). The individual plaintiff bears the burden of persuasion throughout. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

■ A Title VII class action suit such as this one may be analyzed by an adaptation of the individual formula. *E.g., Thompson*, at 283.[7] The plaintiffs must, by statistical evidence, individual testimony, or a combination of the two, make a showing adequate to raise the inference that employment decisions were predicated on an illegal criterion. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977); *Valentino*, 674 F.2d at 67. The defendant may then come forth with evidence of the legitimacy of the challenged practices, subject to rebuttal as merely pretextual. Because this case was decided on

summary judgment, the stages of Title VII proof were telescoped. The undisputed evidence in the record, therefore, should both raise the inference of discrimination and foreclose the possibility that OPS could offer nonpretextual reasons for the challenged practices.

■ Plaintiffs charging discriminatory treatment of a class may build their case on statistical evidence, on descriptions of overtly discriminatory behavior, or on a combination of the two methods. Statistics alone will suffice to show illegally discriminatory treatment, if they are condemning enough. *Teamsters*, 431 U.S. at 336 n.15, 97 S.Ct. at 1855 n.15 (1977); *Valentino*, 674 F.2d at 68. Moreover, statistics may be read in light of other record evidence. Here, for example, the failure to post notices of vacancies, which continued at OPS until 1971, may cast light on the interpretation of the raw promotion statistics also in the record.

■ Statistics, however, must be based on comparisons that are relevant. A showing that few if any blacks were hired for a given kind of job is not probative of discrimination without a showing of the numbers of blacks available in the appropriate labor pool. *Hazelwood School District v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977); *Metrocare v. Washington Metropolitan Area Transit Authority*, 679 F.2d 922, at 930 (D.C.Cir.1982). Similarly, a showing that few if any minorities received promotions is unhelpful unless accompanied by evidence that minorities were available in the pool of employees eligible for promotion. *E.g., Valentino*, 674 F.2d at 67; *Wilkins v. University of Houston*, 654 F.2d 388, 395 (5th Cir. 1981).

contended that the supervisory development course test had been validated by the Civil Service Commission, R. 19, and the plaintiffs had made no showing about other possible methods of selection for the supervisory development course.

7. We note, however, that it remains debatable whether the *Burdine* holding that the burden of persuasion remains with an individual plaintiff should be applied to a class action suit alleging disparate treatment. At least two courts have

held that it should not. *Taylor v. Teletype Corp.*, 648 F.2d 1129, 1136 (8th Cir.), *cert. denied*, 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981); *Vuyanich v. Republic Nat'l Bank*, 521 F.Supp. 656, 659 (N.D.Tex.1981), *appeal docketed*, No. 81–1357 (5th Cir. Aug. 10, 1981). *See generally* Recent Development, *Defendant's Burden of Proof in Title VII Class Action Disparate Treatment Suits*, 31 A.U.L.REV. 755 (1982).

An additional, crucial feature of the plaintiffs' case is a showing that the alleged Title VII charge is timely. Title VII itself provides that administrative complaints of discrimination must be brought within 180 days of the violation alleged, 42 U.S.C. § 2000e–5(e) (1976). Administrative regulations in effect at the time the plaintiffs brought their suit prescribed a shorter limitations period of thirty days, 5 C.F.R. § 713.214(a)(1)(i) (1973), *current version at* 29 C.F.R. § 1613.214(a)(1)(i) (1981). Absent a challenge to the validity of the regulation, therefore, the plaintiffs' complaint will be untimely unless it was brought within thirty days of the Title VII violation alleged. *Valentino*, 674 F.2d at 65; *Milton v. Weinberger*, 645 F.2d 1070, 1074–75 & n.12 (D.C. Cir.1981).

In this case, however, the plaintiffs proceeded on the theory that OPS had engaged in a *continuing* pattern of discriminatory conduct. Plaintiffs charging a continuing violation of Title VII need not show that the entire violation occurred within the actionable period. This court has held that a plaintiff seeking to establish a continuing violation must show "a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the [limitations] period," *Valentino*, 674 F.2d at 65, *quoting* B. SCHLEI & P. GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 232 (Supp.1979). Plaintiffs may not utilize the continuing violation theory to resurrect claims about discrimination concluded in the past, even though its effects persist. *Delaware State College v. Ricks*, 449 U.S. 250, 257, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980); *United Airlines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). Once having shown discrimination continuing into the actionable period,

however, the plaintiffs may also recover for portions of the persistent process of illegal discrimination that antedated the limitations period. *Laffey v. Northwest Airlines*, 567 F.2d 429, 472 (D.C.Cir.1976).[8]

In proving the actionable violation of Title VII, moreover, the plaintiffs are not restricted to evidence of events occurring within the actionable period. As the Supreme Court observed in holding that a discriminatory event not timely charged may no longer be utilized to initiate a Title VII suit, the event still "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." *United Airlines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). Evidence of past practices may illuminate present statistics, or present patterns of behavior.

To summarize, the plaintiffs must show that OPS engaged in discrimination that continued within the actionable period. They may do so by statistics drawn from within and outside of the period. But because this was a motion for summary judgment, the plaintiffs' case needed to have been overwhelming: sufficient both to raise the inference of discrimination and to foreclose the possibility that the employment picture in OPS was anything other than the result of discrimination.

### C. Analysis of the Plaintiffs' Case

In analyzing the sufficiency of the plaintiffs' case, it will be useful to divide it into three parts: the plaintiffs' showing on promotions to uprate and supervisory positions, the positions beyond the journeyman level; the plaintiffs' showing on promotions to journeyman *before* 1972; and the plaintiffs' showing on promotions to journeyman in

---

8. The plaintiffs are, of course, subject to the statutory limit that back pay under Title VII may not accrue for a period more than two years before the filing of the complaint, 42 U.S.C. § 2000e–5(g) (1976). They are also subject to the limit that no one may recover as a member of the plaintiff class who left OPS's employ before the limitations period began, and was therefore ineligible to file a complaint himself during the actionable period. *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 472 (D.C.Cir.1976). The district court's certification of the class to include "all past" black employees of OPS was therefore in error insofar as it included employees who had left OPS before February 10, 1973, 30 days before the filing of the McKenzie complaint.

1972 and 1973. With respect to the first two portions, the plaintiffs' case was indeed overwhelming, but with respect to the third, we find that it was insufficient to support a grant of summary judgment for the plaintiffs.

With respect to uprate and supervisory positions, undisputed record evidence showed, first, that blacks were almost entirely absent from these categories. By 1973, only one black held an uprate position, and his was a very recent promotion. Moreover, these numbers were probative, for the record also contained undisputed evidence that blacks were represented in significant numbers in the pool of employees eligible for promotions, journeymen with at least two years' experience.[9] In addition to the raw numbers, the record also contained full descriptions of training opportunities available to blacks seeking advancement beyond the journeyman level at OPS. It included, for example, evidence that uprate experience was an important factor in promotion decisions but that blacks received relatively little such experience until after the investigation following the CMW complaint. Finally, the record contained undisputed descriptions of the structure by which OPS made promotion decisions during the period extending from the late 1960's through 1973. The underlying structure of supervisory evaluations and rating panels remained a constant. Only two changes were made: in 1971, OPS began to post notice of vacancies, and in 1972 OPS began to include minority EEO representatives on rating panels. In no case, however, were blacks in a majority on a rating panel.

■ We find this evidence sufficient to support summary judgment for the plaintiffs. On sheer numbers, the evidence was overwhelming that OPS had excluded blacks from supervisory and uprate positions. The dearth of blacks in such promotion positions is striking, even up through

1973. Moreover, there is no evidence that OPS overhauled its promotion procedures in such a manner that the figures were likely to change; statistics drawn from the entire period, therefore, can be used as indicative of OPS practices continuing within the actionable period under Title VII. *See, e.g., Valentino*, 674 F.2d at 65–66 (plaintiffs may not invoke prior hiring practices under the continuing violation theory when employer had introduced a new promotion system).

■ The evidence in support of the plaintiffs' claim that GPO had discriminated in selecting journeymen before 1972 is similarly overwhelming. As OPS hired entirely from within, journeymen were drawn from three training programs: the letterpress transfer program, the GPO-wide apprenticeship program, and the OPS offset press assistant program. Although both the apprenticeship program and the offset press assistant program contained sizeable numbers of blacks—in 1969, for example, there were 17 black and 11 white apprentices, CMW complaint file at 183—by far the majority of new journeymen hired through 1971 were white.

Although beginning in 1972 the data concerning journeymen positions change dramatically—*see infra* at p. 74—the record also supports the district court's conclusion that OPS's policies about promotion to supervisory and uprate positions, together with OPS's policies about selection to journeymen, formed part of the same pattern of discrimination, 425 F.Supp. at 142. Offset press assistants, apprentices, journeymen, uprates, and supervisors are paid on the same wage scale, at varying percentages of the journeyman rate. The positions form a single line of progression: assistants and apprentices become qualified for promotion to journeyman after successful completion of their training programs; journeymen become eligible for further advancement after two years' experience. Moreover, OPS used similar supervisory evaluations and rating

---

9. In this appeal, OPS argues strenuously that the district court entirely ignored "applicant flow" data. With respect to promotions beyond the journeyman level, however, the record is clear that although qualified blacks were in the relevant applicant "pool," they did not "flow" beyond it.

panels in selecting journeymen, uprates, and supervisors. This is, therefore, a case in which those seeking advancement to journeyman and those seeking promotions beyond the journeyman level were properly certified as members of the same class, for it is a case of similar employment practices, applied to related employment decisions. *General Telephone Co. of the Southwest v. Falcon,* —— U.S. ——, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (Title VII class action must meet specifications of Fed.R.Civ.P. 23(a). *See generally* Note, *How Far Across-the-Board: the Permissible Breadth of Title VII Class Actions,* 24 Ariz.L.Rev. 61 (1982). It is also a case in which the undisputed record evidence easily brings the set of practices at issue within the continuing violation theory as this court has applied it. *See, e.g., Thompson v. Sawyer,* 678 F.2d 257 (D.C.Cir.1982) (discrimination in training and promotion); *Bethel v. Jefferson,* 589 F.2d 631 (D.C.Cir.1978) (continuing trial board proceedings "a chain of connected events"). *Cf. Stoller v. Marsh,* 682 F.2d 971, 975 (D.C.Cir.1982) (employment decisions not part of a continuing process merely because they concerned the same employment file); *Milton v. Weinberger,* 645 F.2d 1070 (D.C.Cir.1981) (isolated, unrelated employment decisions not a continuing violation). *See generally* B. SCHLEI & P. GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 232 (Supp.1979). As part of the continuing violation, OPS's failure to select blacks for journeymen positions before 1972 was timely charged. We therefore affirm the portion of the district court's holding that OPS discriminated against blacks in the selection of journeymen through 1971.

▆▆▆ We cannot, however, affirm the third portion of the district court's judgment: that in 1972 and beyond, OPS continued to discriminate against blacks in the selection of journeymen. The seriousness of efforts within OPS to end racial discrimination is hotly contested by the parties. OPS contends that through both the offset press assistant program and the apprenticeship program, it demonstrated a clear commitment to racial equality. The plaintiffs argue that even after 1972 these programs

continued to be assigned low priority by OPS. Whether OPS's efforts had resulted in genuine changes in policies of hiring journeymen is clearly an issue in dispute, and therefore not appropriately resolved on a motion for summary judgment. It is, moreover, absolutely crucial to the plaintiffs' case, for after 1971 the statistics shift dramatically. Of the six journeymen selected in 1972 and 1973, all were black. The plaintiffs, therefore, cannot rely on the numbers to build their case that the discriminatory practices in OPS continued to manifest themselves in the selection of journeymen after 1971.

We therefore affirm the first two portions of the district court's grant of summary judgment, but vacate the third. The district court properly concluded that OPS had discriminated in promoting beyond the position of journeyman, and continued to do so. It also judged properly that OPS had discriminated in selecting journeymen through 1971. But the uncontested evidence did not support a decision, on a motion for summary judgment, that OPS had continued to select its journeymen in a discriminatory fashion.

## II. THE TITLE VII REMEDY

To remedy the Title VII violations, the district court awarded both back pay and injunctive relief. The decree was formulated after extensive but fruitless settlement negotiations and was drawn largely from a report drafted by two experts, one recommended by the plaintiffs and the other recommended by GPO. At the time it entered the order on relief, the district court had before it data on employment practices at GPO continuing to 1980. The court found that

> the GPO management still remain[ed] insensitive to problems associated with its promotion practices for blacks and ha[d] undertaken little to reduce the serious disparity between the number of blacks at the lower levels and the number of blacks at the higher levels.

508 F.Supp. at 643.

▆▆▆ Once it has found an intentional violation of Title VII, the district court has

the power to order appropriate affirmative action, including back pay, hiring of members of the plaintiff class, or other equitable relief. 42 U.S.C. § 2000e–5(g) (1976). The framing of a remedial decree is left largely in the hands of the district judge, whose assessment of the needs of the situation is a factual judgment reviewable only for clear error, *see Pullman-Standard v. Swint*, —— U.S. ——, ——, 102 S.Ct. 1781, 1784, 72 L.Ed.2d 66 (1982). The district court's discretion, however, is to be guided by the overriding ameliorative goals of Title VII: "discouraging employers from discrimination, and compensating discrimination's victims as fully as possible," *Thompson*, 678 F.2d at 285.

We must, of course, vacate those portions of the remedial decree dependent on the finding that OPS had continued to violate Title VII with respect to the promotion of blacks to journeyman positions in 1972 and 1973. These portions are: potential awards of back pay to blacks discriminated against in journeyman selections during 1972 and thereafter,[10] and the injunctive remedy insofar as it applies to promotions to journeyman. We affirm the remainder of the back pay award in its entirety. We also affirm the injunctive decree's mandated changes in the training and promotional opportunities offered black journeymen seeking uprate and supervisory positions. Finally, while we agree with the district court that strict goals are needed to ensure that OPS ceases to discriminate in promotion to the supervisory level, we believe that the specification of timetables was unwarranted and overstepped the remedial purposes of Title VII.

### A. *Back Pay*

The district court ordered back pay for all members of the plaintiff class able to show that they had been denied training or promotion in OPS because of racial bias. Back pay was to be available to March 12, 1971, the full two-year period available under Title VII. Amounts of back pay due were

to be calculated on the basis of employment decisions reaching back to August 1969, the date of the first executive order prohibiting discrimination within GPO, 508 F.Supp. at 658. Both the plaintiffs and the defendants object to the nature of the showing required of individual plaintiffs who seek back pay. GPO argues in addition that the back pay award should in no way antedate March 24, 1972, the date of the extension of Title VII remedies to the federal government.

### 1. Individual Showings at the Relief Stage

■ A decision that an employer has violated Title VII with respect to an entire class does not automatically entitle individual class members to share in relief. Members must make some showing that they were potential victims of the discriminatory employment practices. *Teamsters*, 431 U.S. at 367, 97 S.Ct. at 1870. In this case, the district court provided for a special master, who was instructed first to list all promotional openings within OPS after August 1969, classified by whether they were filled by formal application and competition, 508 F.Supp. at 656. Individual class members were to be notified of the opportunity to apply for back pay and were to be awarded back pay provided they made showings as follows. In the case of positions filled by formal application, plaintiffs were required to show they had applied and were rejected. Plaintiffs seeking back pay for other positions were required to show "they would have applied for the training or promotion had they known of its availability," and were advised they might demonstrate their interest in applying by showing *inter alia*:

(a) general eligibility to apply for the training or promotion by virtue of the position held by the would-be applicant at that time; ...

(b) formal application for other, similar training or promotion opportunities; and/or

---

10. Because the relief decree specified that OPS could rebut an application for back pay by showing that the position sought was filled by a black, and because all journeyman openings

in OPS in 1972 and 1973 were filled by blacks, vacating this portion of the remedial decree will not in fact reduce the scope of the back pay award.

(c) that the claimant notified appropriate supervisory officials of his or her interest in being considered for future opportunities.

*Id.* at 657. OPS in turn was advised that it could rebut the showing of any claimant only by proving by clear and convincing evidence either that the position applied for was filled by a black worker or that the claimant was not qualified for the position at issue, *id.*

 We can dispose quite easily of the plaintiffs' contention that the district court erred in requiring individualized hearings at the relief stage. *Teamsters*, while it does not mandate individualized hearings in every case, does require some demonstration that the individual class members receiving compensation were likely victims of illegal discrimination, 431 U.S. at 361, 97 S.Ct. at 1867. The district court must determine whether the plaintiffs' proof at the liability stage is sufficient to establish victimization—as it would be, for example, if all white employees similarly situated to the plaintiffs automatically received a benefit denied to the plaintiffs.[11] If the district court determines that evidence at the liability stage does not identify all members of the plaintiff class as possible victims, however, further evidentiary proceedings are requisite, *id.* at 368, 97 S.Ct. at 1871.

 The district court's decision to require further showings of the plaintiffs here was entirely reasonable. The benefits illegally denied to the plaintiffs as a class were opportunities neither automatically sought nor automatically bestowed. Not all printing plant workers at GPO could expect to receive journeyman training nor is it reasonable to assume that all journeymen would wish to assume supervisory responsibilities. We note that it may prove difficult to work out the details of the back pay arrangement, as it is possible that more than one member of the plaintiff class may be able to show that he would have applied for a particular vacancy, but we leave such complications, should they ensue, in the first instance to the district court.

We also reject GPO's protests that the hearing structure set up by the district court imposed an excessive burden of proof on GPO. GPO makes two objections to the hearing structure, both of which rest squarely on the Supreme Court's recent decision clarifying the allocation of burdens at the liability phase of a Title VII suit by an individual alleging employment discrimination, *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). First, GPO contends that it should have been allowed to rebut individual plaintiffs' claims of victimization by showing any legitimate reason for the selection of another employee, not just by showing that the selectee was black or the applicant was unqualified. Second, GPO argues that the burden of persuasion should neither shift to defendants nor be increased to a showing by clear and convincing evidence, even at the remedial stage of a Title VII proceeding.

In *Burdine*, the individual plaintiff had established a prima facie case of employment discrimination by showing that she was rejected from an available job, for which she was qualified, under circumstances suggestive of discrimination, *id.* at 253, 101 S.Ct. at 1093. The court of appeals had held that the burden of persuasion then shifted to the defendant to establish by a preponderance of the evidence that the actual recipient of the job was better qualified than the plaintiff. In rejecting this view, the Supreme Court held, first, that the ultimate burden of persuasion on liability in such a Title VII suit remains with the plaintiff to prove by a preponderance of the evidence that the defendant discriminated, *id.* at 254, 101 S.Ct. at 1094. Second, *Burdine* held that in meeting the plaintiff's prima facie case, the defendant might advance any legitimate, nondiscriminatory reason for his treatment of the plaintiff and was not limited to a showing that the successful job applicant was superior to the plaintiff, *id.* at 256, 101 S.Ct. at 1095. In relying on *Burdine*, GPO postulates that the

---

11. This determination may be waived, *see* *Thompson*, 678 F.2d at 286.

district court's finding on liability in the plaintiffs' class action suit is to be analogized to the establishment of a prima facie case by an individual plaintiff alleging discriminatory treatment in violation of Title VII.

The situation of an individual class member seeking to share in a back pay award against an employer shown to have violated Title VII, however, is not analogous to the situation of an individual plaintiff who has made out a prima facie case of disparate treatment. *Teamsters*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396, is the case in which the Supreme Court set out most fully the showing that must be made by individual class members claiming the victimization entitling them to share in the relief award. The Court began its analysis in *Teamsters* by noting that the liability phase establishes that the employer was a discriminator, and that the force of this proof at the liability phase remains ever-present when the Title VII remedy is determined. With such a background, the Court held, the employer cannot complain that "there is no reason to believe that its individual employment decisions were discriminatorily based," *id.* at 362, 97 S.Ct. at 1868.

■■■ Class members actually applying for vacancies, such as applicants here for the vacancies to be filled by competition, are therefore presumptively entitled to share in the remedy. Moreover, non-applicants able to show that they should be treated as applicants, *id.* at 364, 97 S.Ct. at 1869, are entitled to the same presumption afforded actual applicants. The victims of subtle, insidious discouragement, the Supreme Court reasoned, are not less entitled to share in Title VII relief than the victims of outright rejection. In both cases, the victims of discrimination are entitled to a presumption in favor of relief; because "recreating the past will necessarily involve a degree of approximation and imprecision," *id.* at 372, 97 S.Ct. at 1873, all doubts are to be resolved against the proven discriminator rather than the innocent employee.

Relying on the same considerations, a line of cases in this circuit have held that when the employer is a proven discriminator, the employer must rebut plaintiffs' claims to particular forms of relief by clear and convincing evidence. In *Day v. Mathews*, 530 F.2d 1083 (D.C.Cir.1976), there was conceded proof that the Department of Health, Education and Welfare had treated Mr. Day's applications for promotion in discriminatory fashion. Day claimed he should receive retroactive promotion; HEW contended that he would not have been promoted even had he not been victimized by discrimination. The court held that retroactive promotion should only be available as a remedy if, absent discrimination, Day would have been promoted. But the court imposed the burden on HEW *as a proven discriminator* to demonstrate by clear and convincing evidence that Day would not have received the promotion in any event, *id.* at 1085. Because it is impossible to recreate the past, the court concluded, "it is only equitable that any resulting uncertainty be resolved against the party whose action gave rise to the problem," *id.* at 1086; *see also Milton v. Weinberger*, 645 F.2d 1070, 1077 n.17 (D.C.Cir.1981); *Bundy v. Jackson*, 641 F.2d 934, 952 (D.C.Cir.1981); *Baxter v. Savannah Sugar Refining Corp.*, 495 F.2d 437, 444–45 (5th Cir.), *cert. denied*, 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974) (after class has prevailed on Title VII liability, individual class plaintiffs must show they were available and qualified for jobs in question, and burden then shifts to the defendant to show by clear and convincing evidence that the class member would not have been promoted; because the past cannot be recreated with certainty, and the discriminatee is the innocent party, all doubts must be resolved against the employer).

The district court applied this reasoning in interpreting the *Teamsters* burden here. Because OPS was a proven discriminator, individual members of the plaintiff class were presumptively entitled to relief upon showing, as they were required to do, that they applied or would have applied for the positions at issue. The district court therefore properly concluded that OPS should be

required to rebut the plaintiffs' individual showings by clear and convincing evidence.

The district court limited the government in its rebuttal to a showing either that the selectee was black or that the applicant was unqualified. GPO argues that it should have been permitted to offer any nondiscriminatory reason on rebuttal and, in particular, that the employee seeking back pay had refused to be considered for the specific opportunity at issue. Brief for Appellant at 44–45. That argument blurs the distinction between rebutting a prima facie case made by an individual and opposing individual relief once there has been a final adjudication of class discrimination. The finding of liability clearly limits the escape routes open to a discriminator. The ruling that an employee's decision not to participate in a discriminatory promotion process might itself have been one of the effects of the discrimination was made after a full hearing at the remedy stage of the case, and we do not discern error.

GPO further complains that the relief order would preclude GPO from showing that the white person selected in fact possessed qualifications superior to those of the black class member. That avenue of rebuttal must be open to GPO, see *Teamsters*, 431 U.S. 371–72, 97 S.Ct. 1872–73, 52 L.Ed.2d 396, and to that extent the relief order must be modified. We underscore, however, that to prevail on such a claim, as we held in *Day* and *Bundy*, GPO's proof must be clear and convincing.

### 2. Retroactivity of the Back Pay Award

[22] GPO objects that the back pay award allowed periods of back pay recovery to reach back to March 12, 1971, slightly over a year before a remedy under Title VII was extended to federal employees.

GPO also protests the decision to allow amounts of back pay accrued during the two year period to be calculated on the basis of employment decisions made after August 1969, when discrimination in GPO was first prohibited by Executive Order.

We have recently upheld a back pay award against the Bindery division of GPO that was retroactive in precisely similar respects. *Thompson*, 678 F.2d at 286–291. We concluded that the 1972 amendments to Title VII had simply extended to federal employees a remedy for illegal discrimination, and that Congress had intended that remedy to be applied to the fullest extent. In August 1969, GPO had been specifically ordered to end discrimination, and cannot now claim to be unjustly surprised if it is held accountable for persisting in prohibited wrongdoing, *id.*, at 291. Following the reasoning in *Thompson*, we uphold the district court's dating of the back pay award here.[12] *See also Johnson v. Lehman*, 679 F.2d 918 (D.C.Cir.1982) (applying retroactively the rule that a federal employee is entitled to a jury trial under the Age Discrimination in Employment Act, 29 U.S.C. § 633a (1976)).

### B. *Injunctive Relief*

On the basis of data reaching to 1980, the district court found that injunctive relief was needed in order to ensure that GPO brought discrimination in OPS to a swift, albeit belated, end. The court therefore ordered that blacks be hired into journeyman, uprate and supervisory positions on an expedited basis. In light of our determination that the grant of summary judgment was inappropriate with respect to selection of journeymen after 1971, we vacate the procedures and the goals mandated for selection of journeymen.[13] For selection

12. The plaintiffs' cross-appeal also objects to the dating of the back pay award. The plaintiffs contend that back pay should be based on decisions reaching to 1965, the date of an earlier order urging programs of affirmative action throughout the executive branch. Executive Order No. 11,246, 30 Fed.Reg. 12,319 (1965). That order, although it was promulgated under the authority of Title VII and recognized that the policy of equal opportunity applies to all federal employment, did not specifically apply

to GPO, which is a part of the legislative branch. We therefore held in *Thompson*, 678 F.2d at 291, that a back pay award against GPO properly considered employment decisions reaching back to 1969. We follow that holding here.

13. Our decision that the decree must be vacated with respect to selection of journeymen moots the issue pressed in this appeal by the intervenor, Washington Printing and Graphic Communications Union. The timetable stipu-

of uprates and supervisors, the district court mandated both changes in procedures and stringent goals and timetables.

The newly mandated procedures involve major changes in the selection panels utilized by GPO in promotion decisions. For each uprate or supervisory vacancy, OPS is to constitute a five-member selection panel, with membership if possible drawn from OPS. At least three members of each panel are to be black, and at least three members of each panel (not necessarily the same three) are to be designated by an Equal Employment Monitoring Committee set up by the remedial order, 508 F.Supp. at 654. For each vacancy, the panel is to select a group of "best qualified" employees, drawn from employees at the next lowest level with a stipulated amount of service and six-months' satisfactory leave and disciplinary records.[14] Selection is to be based on validated, job-related performance standards. From the "best qualified" group, the panel is then to select five applicants, based on an "evaluation and selection guide" to be set up by the Office of Personnel Management or an appointed expert, and including as a factor the individual's "ability to work with or supervise a racially mixed group of employees," *id.* at 655. The names and records of the five are then to be forwarded to the superintendent of OPS, who may select any one of the five to fill the vacancy.

We affirm the district court's decision that sweeping changes were needed in promotion practices at OPS. At the beginning of 1981, nearly four years after the decision on liability in this case, no blacks held foreman or assistant foreman positions in OPS,

*id.* at 643. We also affirm the format chosen by the district court. It was based largely on the recommendations arrived at jointly by one expert selected by OPS and one expert selected by the plaintiffs. The experts recommended that OPS shift from reliance on supervisory evaluations to reliance on length of service and performance in promotion positions in choosing supervisory and uprate employees. R. 209 at 3–1. The procedures chosen by the district court are a reasonable method of changing selection methods to accord with these recommendations.

In addition to these changes in selection procedures, OPS was also required to meet goals and timetables in promoting black employees. For uprate, group chief, and assistant foreman positions, the goal to be achieved was in each case 60% blacks within four years, 508 F.Supp. at 655. For foreman positions, the target was 50% blacks, *id.* at 656. On top of the goals, OPS was also required to meet timetables for the selection of uprates, group chiefs, and assistant foremen. In each case, OPS was directed to promote blacks at a rate of 80% in order to ensure that the goals were met, *id.* at 655. Failure on the part of OPS to comply with the 80% selection rates after two years was to result in an increase in the rate to 90%, together with abolition of the interim selection step of picking a group of "best qualified" employees for each position, *id.* at 656. No separate timetables were established for promotions to foreman.

We have recently approved the use of goals in fashioning relief under Title VII. *Thompson,* 678 F.2d at 294. In approving goals, however, we cautioned that they

---

lated for hiring of journeymen—that 90% of journeyman positions must go to members of the plaintiff class until 90% of all OPS journeymen are black—allegedly threatens the program under which letterpressmen may transfer to offset as GPO phases out their division. The union intervened on behalf of the letterpressmen, arguing that the remedial decree threatened to undercut valid seniority rights. While the seniority claim is certainly a serious one, *see American Tobacco Co. v. Patterson,* —— U.S. ——, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982) (bona fide seniority rights must be honored in relief under Title VII), it is not one we must reach here.

14. For promotions to uprate, group chief, and assistant foreman, the "best qualified" group was to be drawn from journeymen with at least one year's experience. It was to include at least 20 journeymen, or 10% of all journeymen with the requisite experience, leave, and disciplinary records, whichever number was larger. For positions at the level of foreman or above, the "best qualified" group was to be selected from among employees at the position just below, and was to consist of no stipulated number. 508 F.Supp. at 655.

should be as limited as needed to end discrimination effectively, targeted at the specific discrimination to be eradicated as consistent as possible with the legitimate concerns of others, and if possible supplanted by other forms of relief, *id.*

The 60% and 50% goals selected by the district court here meet our concern that goals not overreach their usefulness. They were selected after consideration of the emerging employment picture at OPS: by 1978, nearly half of the journeymen and one-third of the uprates were blacks, R. 209 at 6–7, and these numbers will increase as OPS selects from within. The goals are of relatively short duration—four years—and the district court hopefully will not be long in the business of supervising OPS's efforts to mend its ways. The goals are targeted precisely at the discrimination found: that OPS has been especially dilatory in promoting blacks to positions beyond the level of journeyman. Finally, the goals are flexible: they will permit OPS to make employment decisions that accommodate the interests of its other employees, while moving expeditiously to end discrimination.

The timetables, however, are another matter. We fail to see why they are necessary in addition to the sweeping changes in promotion practices and the hiring goals. The changes in promotion procedures are aimed to root out discrimination in the promotion process, and the goals will serve as a check to ensure that the changes really take hold. To mandate timetables in addition is to place OPS in a straightjacket that is quite likely unnecessary. The timetables would reduce OPS's flexibility in meeting the needs of all its employees. Moreover, depending on the numbers of vacancies within OPS, it is possible that by meeting the timetables, OPS might overshoot the goals. We therefore direct the district court to delete the timetables from the injunctive decree.

### III. Conclusion

In sum, we affirm the district court's grant of summary judgment for the plaintiffs on promotions to uprate and supervisory positions, and on selection of journey-men through 1971. We remand for further proceedings the district court's finding that OPS continued to discriminate in the selection of journeymen after 1972. We affirm the back pay award, except as it applies to journeyman vacancies after 1971 and with the modification that GPO also be permitted to defeat recovery by a class member upon a clear and convincing showing that the person selected for the job was better qualified. We vacate those aspects of the injunctive decree that depended on the finding that OPS had continued to discriminate in the selection of journeymen after 1971. Except for the district court's additional mandate of timetables, we affirm all other aspects of the injunctive remedy.

Despite the fact that this case was never fully tried, it has now lingered for nearly ten years. The very duration of the case posed problems both for the parties and for us on review: for example, in considering the propriety of the grant of summary judgment, it was necessary to reconstruct the record scrupulously as it was at the time of the judgment. Moreover, we recognize that OPS has for a time operated under an injunctive order that we have now had to vacate in part in light of our holding that it was improper to grant summary judgment to the plaintiffs on their claim that OPS continued to discriminate in the selection of journeymen.

Our decision is not a warrant for OPS to return to its discriminatory ways, however. In the proceedings to follow, whatever they may be, both parties should bear in mind that discriminatory practices can fade over time. When they do not fade, however, they become increasingly anomalous and ugly, and the need to extirpate them becomes correspondingly more pressing. As we said in *Thompson*, it is long past time for GPO to get back to its appointed tasks.