Alfred U. McKENZIE, et al.

v.

Ralph E. KENNICKELL, Jr., Public Printer, Appellant.

No. 84–5785.

United States Court of Appeals, District of Columbia Circuit.

Argued March 27, 1985.

Decided July 31, 1987.

As Amended July 31, 1987.

---

John D. Bates, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on brief, for appellants.

Douglas L. Parker, with whom Roderic V.O. Boggs, Washington, D.C., was on brief, for appellees. Elliot M. Mincberg, Washington, D.C., also entered an appearance for appellees.

Before ROBINSON, EDWARDS and SCALIA *, Circuit Judges.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

We are asked to determine the propriety of an order entered by the District Court in the remedial phase of an employment discrimination suit against the United States Government Printing Office (GPO).[1]

On January 12, 1977, the District Court found GPO in violation of Title VII of the Civil Rights Act of 1964[2] for engaging in racially discriminatory hiring and promotional practices in its offset press section.[3] The court issued a final order on January 30, 1981, providing classwide relief, including goals and timetables for hiring and promotion over a period of four years.[4] Both rulings were appealed to and substantially affirmed by this court on July 27, 1982.[5]

The appeal now before us arises from a subsequent order of the District Court, entered September 19, 1984, in response to a motion by the plaintiff class to compel compliance with the terms of that court's 1981 order. The 1984 order, in relevant part,[6] required GPO to select a member of the plaintiff class to fill the position of head offset pressman on the second shift in the offset press section.[7] GPO protests this directive on the ground that it is inconsistent with this court's 1982 decision respecting the District Court's 1981 order.[8] We agree, and we reverse.

---

* Judge (now Justice) Scalia was a member of the panel at the time this case was argued, but did not participate in this opinion.

1. *McKenzie v. Barrett*, Civ. No. 73–0974 (D.D.C. Sept. 19, 1984) (order), Joint Appendix (J.App.) 21.

2. 42 U.S.C. §§ 2000e–2000e–17 (1982).

3. *McKenzie v. McCormick*, 425 F.Supp. 137 (D.D.C.1977).

4. *McKenzie v. Saylor*, 508 F.Supp. 641 (D.D.C. 1981).

5. *McKenzie v. Sawyer*, 221 U.S.App.D.C. 288, 684 F.2d 62 (1982).

6. The 1984 order may be separated into four parts. The first part directed the hiring of a member of the plaintiff class to fill the position of head offset pressman on the second shift. This is the only portion of the order here at issue. The second part of the order addressed procedures for filling future vacancies in uprate and supervisory positions. This portion was remanded to the District Court at the request of the parties, see *McKenzie v. Kennickell*, No. 84–5785 (D.C.Cir. Mar. 7, 1985) (order), and an agreement thereon has been reached and approved by the District Court. See Relief Agreement, *McKenzie v. Kennickell*, Civ. No. 73–0974 (D.D.C.) (filed Apr. 3, 1985). The third and fourth parts of the order required the filing of reports by GPO. Since these reports have been filed, any questions regarding these portions are now moot.

7. *McKenzie v. Barrett, supra* note 1, at 1, J.App. 21. GPO moved for summary reversal or, in the alternative, for a stay pending appeal. Emergency Motion for Summary Reversal, *McKenzie v. Barrett*, No. 84–5785 (D.C.Cir.) (filed Dec. 3, 1984). This court denied the motion for summary reversal, *McKenzie v. Barrett*, No. 84–5785 (D.C.Cir. Dec. 7, 1984) (order), J.App. 27, but ordered that any action taken by the District Court should "not displace any present employees." *Id.*

8. Reply Brief for Appellant at 3–8.

## I

As the history of this litigation has elsewhere been recounted in some detail,[9] we need focus only on the remedial components of the 1981 order. That order awarded backpay to victims of racial discrimination at GPO, as well as several types of injunctive relief pertinent to disposition of this appeal. The order mandated various alterations in GPO's training and promotional practices, including modifications in training programs through which employees advance to journeyman, uprate, and supervisory positions in the offset press section, as well as new procedures by which journeymen would be selected for promotion to uprate and supervisory positions. These changes were designed to rectify the discriminatory bias pervading former selection and promotional procedures.[10] In addition, to ameliorate the continuing effects of GPO's past discrimination, which over the years had produced a racially stratified workplace, the order set goals and imposed timetables for promotion of members of the plaintiff class. For promotions to uprate positions and the positions of group chief and assistant foreman, the goal was 60 percent occupancy of those positions by members of the plaintiff class by January 1, 1985, four years from the date of the order;[11] and for foreman positions the goal was 50 percent.[12] These percentage goals were adopted by the District Court in light of the composition of the applicant pools for the positions.[13]

Finally, in an effort to ensure that GPO would achieve these goals within the four-year period, the order established mandatory selection rates. For promotions to all positions except foreman, GPO was to fill 80 percent of vacancies occurring after the date of the order with members of the plaintiff class.[14] This rate was to be met by the end of the second year after the date of the order, and by the end of each succeeding two-year period, until the percentage goals for the positions were achieved. If GPO failed to meet the 80 percent selection rate by the end of the first two-year period, the selection rate was to increase to 90 percent.[15]

GPO appealed to this court from both the remedial provisions of the order and the finding of racial discrimination on which they were predicated. In 1982, we affirmed the District Court's finding, concluding that the plaintiffs' evidence was "overwhelming"—ample to justify summary judgment on the ground that the offset press section had discriminated in selecting journeymen and in promotions to uprate and supervisory positions.[16] Only with respect to alleged discrimination in the selection of journeymen after 1971 was the evidence deemed insufficient to support the award of summary judgment.[17] The remedial portions of the 1981 order were affirmed in most respects, this court concurring with the District Court that "sweeping changes were needed in promotional practices at OPS,"[18] and noting that in 1981, four years after the finding of discrimination, still no black employees held foreman or assistant foreman positions in the offset press section.[19]

We also approved the following revised promotional procedures imposed by the 1981 order. For each uprate or supervisory vacancy, GPO is to convene a five-member selection panel, of which at least three members must be black. This panel is to select a group of "best qualified" employees on the basis of job-related per-

**9.** See *McKenzie v. Sawyer, supra* note 5.

**10.** *McKenzie v. Saylor, supra* note 4, 508 F.Supp. at 644–645. See *Ledoux v. District of Columbia*, 820 F.2d 1293 (D.C.Cir.1987) at 1299 (one of the principal purposes of Title VII is to abolish traditional patterns of racial segregation and hierarchy).

**11.** *McKenzie v. Saylor, supra* note 4, 508 F.Supp. at 655.

**12.** *Id.* at 655–656.

**13.** *Id.* at 645.

**14.** *Id.* at 655–656.

**15.** *Id.* at 656.

**16.** *McKenzie v. Sawyer, supra* note 5, 221 U.S. App.D.C. at 298–300, 684 F.2d at 72–74.

**17.** *Id.* at 300, 684 F.2d at 74.

**18.** *Id.* at 305, 684 F.2d at 79.

**19.** *Id.*

formance standards. From this group, five applicants are to be nominated in accordance with an evaluation and selection guide furnished by GPO. The five names are to be certified to the superintendent of the offset press section, who may select any one of the five to fill the vacancy.[20]

We likewise affirmed the promotional goals set by the District Court, cautioning, however, that pursuit of them "should be as limited as needed to end discrimination effectively, targeted at the specific discrimination to be eradicated as consistent as possible with the legitimate concerns of others, and if possible supplanted by other forms of relief."[21] In light of these concerns, we judged the 60 and 50 percent goals of the order appropriate:

They were selected after consideration of the emerging employment picture at [the offset press section]: by 1978, nearly half of the journeymen and one-third of the uprates were blacks ... and these numbers will increase as [the section] selects from within. The goals are of relatively short duration—four years— and the district court hopefully will not be long in the business of supervising [the section's] efforts to mend its ways. The goals are targeted precisely at the discrimination found: that [the section] has been especially dilatory in promoting blacks to positions beyond the level of journeyman. Finally, the goals are flexible: they will permit [the section] to make employment decisions that accommodate the interests of its other employees, while moving expeditiously to end discrimination.[22]

Although we approved the revised promotional procedures and goals mandated by the 1981 order, we held that the selection rates ordered by the District Court were unwarranted. We concluded that the promotional procedures and goals set forth in the order were sufficient to cure the continuing effects of discrimination at GPO: "[t]o mandate timetables in addition," we said, "is to place [the offset printing section] in a straight jacket that is quite likely unnecessary."[23] More importantly, we observed, the goals we approved would allow GPO flexibility in complying with the relief order, whereas the selection rates in question "would reduce [the section's] flexibility in meeting the needs of all its employees."[24] We therefore directed that the selection rates be deleted and, with these modifications, implementation of the order proceeded.

## II

In August, 1984, at a time when GPO's ability to meet its remedial goals by the deadlines specified appeared doubtful, the plaintiff class moved to compel compliance with the terms of the 1981 order.[25] The immediate impetus for the motion was GPO's announced intention to promote a white employee from offset pressman to head offset pressman on the second shift, an uprate position, despite the availability of a black "best qualified" candidate for the job.[26] The plaintiffs pointed out that as of August 8, 1984, only 45 percent of those in uprate positions were black, considerably short of the 60 percent goal to be

20. *Id.*; see also *McKenzie v. Saylor, supra* note 4, 508 F.Supp. at 654–655.

21. *McKenzie v. Sawyer, supra* note 5, 221 U.S. App.D.C. at 306, 684 F.2d at 80 (citing *Thompson v. Sawyer,* 219 U.S.App.D.C. 393, 440, 678 F.2d 257, 294 (1982)).

22. *McKenzie v. Sawyer, supra* note 5, 221 U.S. App.D.C. at 306, 684 F.2d at 80.

23. *Id.*

24. *Id.*

25. Plaintiffs' Fourth Motion to Compel Compliance With Final Order, *McKenzie v. Barrett,* Civ.

No. 73–0974 (D.D.C.) (filed Aug. 15, 1984), Record Document (R.Doc.) 258.

26. Memorandum in Support of Plaintiffs' Fourth Motion to Compel Compliance with Final Order, *McKenzie v. Barrett,* Civ. No. 73–0974 (D.D.C.) (filed Aug. 15, 1984) at 2–4, R.Doc. 258 [hereinafter Compliance Memorandum]. GPO is required by the 1981 order to give the plaintiffs' equal employment opportunity monitoring committee 30 days notice of any promotion to an uprate or supervisory position in the offset printing section. See *McKenzie v. Saylor, supra* note 4, 508 F.Supp. at 649.

met by January 1, 1985.[27] The plaintiffs questioned GPO's good-faith effort to meet the 60 percent goal in timely fashion, and moved to have a class member placed in the vacancy.[28]

In response, GPO insisted that it had been acting in good faith. It pointed to the fact that of the 28 promotions to uprate positions since promulgation of the 1981 order, 22, or 78.6 percent, had gone to members of the plaintiff class. If supervisory positions were considered, GPO observed, the percentage would be even higher, since 33 of 40 promotions, or 82.5 percent, went to class members.[29]

Notwithstanding GPO's assertion of good faith efforts to comply with its remedial obligations, the District Court's 1984 order enjoined GPO to select a member of the plaintiff class to fill the available position.[30] It is this order whose propriety GPO contests in the instant appeal. GPO complied with the 1984 order but, in consequence of candidate attrition, ultimately promoted a class member not on the original list of "best qualified."

In accordance with the terms of the 1981 order, a five-member selection panel certified to the superintendent of the offset press section five candidates as "best qualified." Two of the five were black. Before the 1984 order issued, one of the black candidates accepted promotion to a different position as head offset pressman at GPO.[31] The superintendent chose a white candidate for promotion, prompting the plaintiffs' motion for compliance and the issuance of the 1984 order directing promotion of a member of the plaintiff class. After that order issued, the other black candidate declined the head offset pressman job in order to accept promotion to second web offset pressman.[32] Because no class member remained in the original group of "best qualified" selectees, a class member not originally on the "best qualified" list was certified to and ultimately selected by the superintendent.[33]

### III

We conclude that the District Court's 1984 order, so far as it requires selection of a class member for promotion,[34] is inconsistent with this court's 1982 decision. Clearly, a concern that GPO would not attain the goals of the 1981 order within the deadlines specified moved the District Court to intervene in GPO's promotional process, but anticipated delay alone was not sufficient ground therefor. The court was obliged to ascertain the cause of the projected delay and to determine whether the 1981 order, as modified by this court, left it free to intervene in such circumstances. Our review convinces us that the requisite authority was lacking.

**27.** Compliance Memorandum, *supra* note 26, at 2 n. 2, R. Doc. 258.

**28.** Plaintiffs' Fourth Motion to Compel Compliance With Final Order, *supra* note 25, at 2, R. Doc. 258.

**29.** Defendant's Response to Plaintiffs' Fourth Motion to Compel Compliance with Final Order, *McKenzie v. Barrett*, Civ. No. 73–0974 (D.D.C.) (filed Sept. 5, 1984) at 3, R. Doc. 262; see also Brief for Appellant at 23; Reply Brief for Appellant at 4–5.

**30.** *McKenzie v. Barrett, supra* note 1, at 1, J.App. 21. For summary of additional terms of the September 19 order, see note 6 *supra*.

**31.** Defendant's Report Regarding Efforts to Select a Class Member for the Position of Head Offset Pressman, *McKenzie v. Barrett*, Civ. No. 73–0974 (D.D.C.) (filed Oct. 19, 1984) at 2, R.Doc. 269 [hereinafter Defendant's Report];

see also Affidavit of Francis R. Del Bianco, Superintendant, Press Division, United States Government Printing Office (filed Oct. 19, 1984) at 2, J.App. 7 [hereinafter Del Bianco Affidavit].

**32.** Defendant's Report, *supra* note 31, at 1, R.Doc. 269; Del Bianco Affidavit, *supra* note 31, at 1, J.App. 6.

**33.** Defendant's Report, *supra* note 31, at 2, R.Doc. 269; Del Bianco Affidavit, *supra* note 31, at 2, J.App. 7. GPO apparently interpreted the December 17, 1984 order of this court, see note 7 *supra*, denying its motion for summary reversal, as requiring reinstatement of the white employee originally promoted, and proceeded to reinstate him accordingly. See note 57 *infra*. The controversy remains live, however, since another member of the plaintiff class could be placed in the contested position.

**34.** See note 6 *supra*.

As the plaintiff class acknowledges, GPO's "failure to meet the uprate goal has occurred primarily because GPO's projections about the frequency of vacancies, on which plaintiffs had based their request for a four-year time period, proved inaccurate." [35] This court's decision respecting the 1981 order was infected with the same faulty estimate. The court struck the mandatory selection rates from the order, reasoning that the newly-mandated promotional procedures and goals were sufficient in and of themselves to achieve timely compliance with remedial objectives within the designated four-year period. Indeed, the court was of the view that were GPO required to make promotions in accordance with the 80 percent selection rate specified in the order, "depending on the numbers of vacancies within [the offset press section, it] might overshoot the goals." [36]

As it developed, the assumption that the promotional goals for uprate positions could be reached within the four-year period, without mandatory selection rates akin to those originally incorporated into the 1981 order, proved fallacious. Not only did the rate of job vacancies fail to accelerate realization of the goals, but it in fact impeded their timely achievement.

## IV

Despite GPO's compliance efforts—particularly its promotion of class members to uprate positions at a frequency approaching the 80 percent selection rate struck from the 1981 order [37]—attainment of the uprate promotional goals within the four-year period appeared unlikely at the time of the 1984 order. This single circumstance did not, however, justify renewed intervention on behalf of the plaintiff class. This court spurned the selection rates mandated by the 1981 order in the belief that they were unnecessary to timely achievement of the employment goals, but made equally clear the independent concern that such rates would "reduce [GPO's] flexibility in meeting the needs of all its employees." [38] Given the clearly expressed admonition that any injunctive relief must afford GPO "flexibility in meeting the needs of all its employees," [39] GPO's impending failure to meet timely the goals of the 1981 order did not warrant the action the District Court took. While the rate of job turnover diminished promotional opportunities for members of the plaintiff class, it similarly affected promotional opportunities for other employees, and an increase in the rate at which class members would secure promotions would just as surely correspondingly diminish such opportunities for others. In light of the fact that GPO was already promoting class members at a rate that this court explicitly declined to require, the District Court overstepped its authority when it dictated a selection on terms still more stringent. By treating the remedial goals and timetables of the 1981 order as unyielding, the District Court's 1984 order undeniably imposed a "straightjacket" [40] on a GPO promotion decision at a time when more flexibility, not less, was needed. Absent a finding of bad-faith resistance to that order's unmodified injunctive provisions that might justify special remedial measures, we hold the District Court's 1984 order inconsistent with our 1982 mandate. [41]

We find admirable the District Court's concern that relief from wrongdoing be efficacious, but view it as inapposite in the circumstances of this case. Lacking in the 1984 order is a recognition that invocation of Title VII remedies may well necessitate a degree of flexibility. The District Court

---

35. Brief for Appellee at 4; see also Reply Brief for Appellants at 2 n. 2.

36. *McKenzie v. Sawyer, supra* note 5, 221 U.S. App.D.C. at 306, 684 F.2d at 80.

37. See *id.* at 305–306, 684 F.2d at 79–80.

38. *Id.* at 306, 684 F.2d at 80.

39. *Id.*

40. *Id.*

41. The mandate of this court bound any further action by the District Court. See *Maggard v. O'Connell,* 227 U.S.App.D.C. 62, 67, 703 F.2d 1284, 1289 (1983); *City of Cleveland v. FPC,* 182 U.S.App.D.C. 346, 348–349, 561 F.2d 344, 346–347 (1977); *Wheeler v. City of Pleasant Grove,* 746 F.2d 1437, 1440–1441 (11th Cir.1984).

measured compliance with its 1981 order in overly rigid terms, limiting its focus, it would seem, to the interests of the plaintiff class. In short, the court overlooked the traditions of equity that supply the foundation principles for awards of Title VII relief.

As the Supreme Court has now repeatedly counseled, courts fashioning Title VII remedies must endeavor to accommodate the interests of innocent third parties when vindicating the rights of victims of discrimination. In *Teamsters v. United States,* [42] the Court made this plain:

> Although not directly controlled by the Act, the extent to which the legitimate expectations of nonvictim employees should determine when victims are restored to their rightful place is limited by basic principles of equity. In devising and implementing remedies under Title VII, no less than in formulating any equitable decree, a court must draw on the "qualities of mercy and practicality [that] have made equity the instrument for nice adjustment and recognition between the public interest and private needs as well as between competing private claims."... Especially when immediate implementation of an equitable remedy threatens to impinge upon the expectations of innocent parties, the courts must "look to the practical realities and necessities inescapably involved in reconciling

competing interests," in order to determine the "special blend of what is necessary, what is fair, and what is workable." [43]

More recently, in *Sheet Metal Workers International Association v. EEOC,* [44] the Court sustained the remedial use of hiring goals when designed and enforced with a tempering measure of flexibility. A plurality of the Court, speaking through Justice Brennan, emphasized that the trial court had twice adjusted the deadline for achievement of the goals; had modified their terms to account for the fact that economic circumstances not within the defendant union's control might have prevented it from realizing those objectives; and had shown itself disposed "to accommodate *legitimate* explanations for the [union's] failure to comply with the court's orders." [45] Furthermore, the plurality stressed, "we think it significant that ... the membership goal [does not] 'unnecessarily trammel the interests of white employees.'" [46] These same concerns were substantially reiterated in a concurring opinion by Justice Powell.[47] A majority of the Court thus approved the use of hiring goals by courts fashioning Title VII remedies when they are imposed flexibly and with due regard for the interests of other employees.

---

**42.** 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

**43.** *Id.* at 374–375, 97 S.Ct. at 1874–1875, 52 L.Ed.2d at 439–440 (footnote and citations omitted).

**44.** 478 U.S. ——, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986).

**45.** 478 U.S. at ——, 106 S.Ct. at 3051, 92 L.Ed.2d at 389 (plurality opinion) (emphasis in original).

**46.** *Id.* at ——, 106 S.Ct. at 3052, 92 L.Ed.2d at 390 (plurality opinion) (quoting *United Steelworkers v. Weber,* 443 U.S. 192, 208, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480, 492 (1979)).

**47.** Justice Powell concurred in part and concurred in the judgment. In approving the trial court's management of the remedial phase of the case, Justice Powell similarly highlighted its flexible imposition of numerical goals, pointing

to the court's willingness to postpone timetables before imposing sanctions as attestation of an understanding that effectuation of a Title VII remedy, and not racial balance per se, was at stake. *Sheet Metal Workers Int'l Ass'n v. EEOC, supra* note 44, 478 U.S. at ——, 106 S.Ct. at 3056, 92 L.Ed.2d at 395–396 (concurring opinion). He further emphasized that the relief granted was appropriate insofar as it did not place undue burdens on nonminorities, distinguishing the case from *Wygant v. Jackson Bd. of Educ.,* 476 U.S. ——, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), where a consent decree required employment of a constant percentage of minority teachers, even when layoff of nonminority teachers with greater seniority resulted, thus placing "'the entire burden of achieving racial equality on particular individuals....'" *Sheet Metal Workers Int'l Ass'n v. EEOC, supra* note 44, 478 U.S. at ——, 106 S.Ct. at 3056, 9 L.Ed.2d at 396 (concurring opinion) (quoting *Wygant v. Jackson Bd. of Educ., supra,* 476 U.S. at ——, 106 S.Ct. at 1851–1852, 90 L.Ed.2d at 274).

Last term in *United States v. Paradise*,[48] the Court again sanctioned the use of employment goals in fashioning Title VII remedies. Upon a finding that the Alabama Department of Public Safety had systematically discriminated in hiring and promoting state troopers, the Court affirmed an order providing that qualified members of the plaintiff class were to be promoted on a one-for-one basis with nonvictim employees until a goal of 25 percent was attained. The order in question was conditional in its application, to be enforced "only *if* there were qualified black candidates, *if* the rank were less than 25% black, and *if* the Department had not developed and implemented a promotional plan without adverse impact for the relevant rank."[49] Although the department had long resisted compliance with prior remedial orders, the Court repeatedly referred to the conditional features of the order. A plurality of the Court, speaking through Justice Brennan, described the one-for-one promotional requirement—in effect, a 50 percent selection rate—as "flexible, waivable, and temporary in application,"[50] and "hedged about with specific qualifying measures designed to prevent any unfair impact that might arise from rigid application."[51] The plurality concluded that "the District Judge properly balanced the individual and collective interests at stake, including the interests of the white troopers eligible for promotion, in shaping this rem-

edy."[52] Justice Powell, concurring, noted that the "District Court's order contains significant elements of flexibility and fairness," and pointed out that the impact of the order on nonvictim employees "is likely to be relatively diffuse."[53] Justice Stevens, also concurring, reiterated that the "District Court's task in each case is to 'be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.'"[54]

Together, these decisions insist that Title VII remedies are to be designed and enforced with appropriate attention to the interests of nonvictim employees—in the words of this court, "with care to see that they wound as little as possible."[55] The need for flexible enforcement of employment goals is at its maximum when the legitimate interests of third-party employees are at stake.[56] Here, when the District Court saw that the promotional goals of its final order might not be realized in a timely fashion—for reasons involving no bad faith on the part of the governmental defendant—it was obliged to countenance some delay in their attainment before it could adopt additional remedial measures that would increase the burden to be borne by other employees whose opportunities for promotion had already been significantly

---

**48.** —— U.S. ——, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987).

**49.** *Id.* at ——, 107 S.Ct. at 1063, 94 L.Ed.2d at 218 (plurality opinion) (emphasis in original).

**50.** *Id.* at ——, 107 S.Ct. at 1071, 94 L.Ed.2d at 228 (plurality opinion).

**51.** *Id.* at ——, 107 S.Ct. at 1072, 94 L.Ed.2d at 230 (plurality opinion) (footnote omitted).

**52.** *Id.* at ——, 107 S.Ct. at 1074, 94 L.Ed.2d at 232 (plurality opinion). As the plurality assessed the impact of the one-for-one promotions order, it

> did not impose an unacceptable burden on innocent third parties.... It was used only once at the rank of corporal and may not be utilized at all in the upper ranks. Nor has the court imposed an "absolute bar" to white advancement.... In the one instance in which the quota was employed, 50% of those elevated were white.

*Id.* at ——, 107 S.Ct. at 1073, 94 L.Ed.2d at 230 (plurality opinion) (citation omitted).

**53.** *Id.* at ——, 107 S.Ct. at 1076, 94 L.Ed.2d at 234 (concurring opinion).

**54.** *Id.* at ——, n. 4, 107 S.Ct. at 1079–1080 n. 4, 94 L.Ed.2d at 239 n. 4 (concurring opinion) (quoting *Brown v. Board of Educ.*, 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083, 1106 (1955)).

**55.** *Thompson v. Sawyer, supra* note 21, 219 U.S. App.D.C. at 430, 678 F.2d at 293.

**56.** As this court cautioned in a recent sex discrimination case involving GPO, care in the use of hiring goals is required, among other reasons, because other minority employees may be among those whose employment opportunities are affected by them. See *id.* at 430–432, 678 F.2d at 294–296 (Title VII and Equal Pay Act remedy).

curtailed during the long journey toward nondiscriminatory employment.

## V.

We reverse the District Court's 1984 order, to the extent that it requires the placement of a class member in the position of head offset pressman in GPO's offset printing section.[57] Our decision to do so stems solely from the court's failure to give adequate weight to interests of third parties affected by the order—a concern expressed by this court on its 1982 review of the District Court's 1981 order, and a function mandated by recent Supreme Court precedent. The District Court's evident commitment to providing the plaintiff class effective and expeditious relief meets with our wholehearted approval so long as its effectuation duly regards the full range of obligations to be accommodated in the crafting of Title VII remedies.

We thus encourage the District Court to explore such alternative forms of relief as might prove to be necessary and appropriate. For example, that court's 1984 order requests information on the prospects of modifying GPO's subcontracting arrangements to expand employment opportunities for all GPO employees.[58] This step, if economically feasible, might serve admirably to reconcile the interests of the plaintiff class and nonmember employees. Should delay in achieving the promotional goals of the 1981 order become excessive, a formal modification of the remedial timetable, undertaken in light of the actual rate of job turnover and the competing interests of other employees, might be warranted. While we express no view on the particulars of such alternatives, they do manifest a proper regard for the welfare of all GPO employees, and perhaps an appropriate exercise of the District Court's remedial authority in this case.

*Order reversed in part and case remanded.*

---

57. So far as we are advised, this disposition will not result in any change in the status quo. A white employee temporarily assumed the position of head offset pressman pending resolution of the plaintiffs' motion to compel compliance. Compliance Memorandum, *supra* note 26, at 1 n. 1. The District Court's 1984 order forced the removal of that employee and his replacement with a class member. Defendant's Report, *supra* note 31; see also Brief for Appellant at 10 n. 13. GPO apparently interpreted the December 7, 1984 order of this court denying its motion for summary reversal, see note 33 *supra,* as requiring the reinstatement of the white employee. Reply Brief for Appellant at 3 n. 4, and the displaced black employee has since been promoted to another uprate position. See Appellant's Notice of Change in Facts, *McKenzie v. Kennickell,* Civ. No. 84–5785 (D.C.Cir.) (filed Sept. 20, 1985) at 1.

58. *McKenzie v. Barrett, supra* note 1, at 2–5, J.App. 22–25.